## Louisville & Nashville Railroad Company v. Heinig's Administratrix.

(Decided December 18, 1914.)

### Appeal from Whitley Circuit Court.

1. Master and Servant—Injuries to Servant—Railroads—Collision— Issufficient Rules and Methods of Operation—Negligence.—In an action for damages for the death of an engineer, killed in a wreck alleged to have been caused by defendant's negligence in changing the meeting point without notice to the decedent, and in not having sufficient rules to give proper notice of changes in the meeting points of trains, evidence examined and held insufficient to sustain the charge of negligence.

2. Master and Servant—Injuries to Servant—Railroads—Collision— Negligence of Employes of Waiting Train—In an action for damages for the death of an engineer resulting from the collision of two trains, evidence examined, and held insufficient to show negligence of the employes of the waiting train in failing to turn the switch, or in stopping that train too near the switch.

3. Master and Servant—Injury to Servant—Railroads—Collision— Topographical Conditions of Meeting Point—Negligence—Evidence.—In an action for damages for the death of an engineer resulting from the collision of two trains, evidence considered and

held insufficient to show negligence on the part of the defendant in placing the switch of the passing track where trains were to meet at a place where the view was obscured by an embankment and trees.

4. Master and Servant—Injury to Servant—Railroads—Failure to Adopt Block Signal System—Assumption of Risk.—An engineer of long experience, who has been in the employ of a railroad for a number of years, knows and appreciates the danger growing out of the failure of the company to adopt and have in use the block signal system, and assumes the risk of such danger.

5. Master and Servant—Injury to Servant—Railroads—Rules—Contributory Negligence—Federal Employers' Liability Act.—A rule of a railroad company imposing on its conductor the duty of placing himself in a position to hear the meeting point signals, and failing to hear and clearly understand them, to stop his train, is for the benefit not only of passengers but of employes on the train, and the contributory negligence of an employe does not, in an action under the Federal Employers' Liability Act, deprive him of the benefit of the rule where its violation would be negligence as to anyone else on the train.

6. Master and Servant—Injury to Servant—Railroads—Contributory Negligence—Federal Employers' Liability Act.—In an action against a railroad company under the Federal Employers' Liability Act, it is only where the employe's act is the sole cause of the injury, and defendant's act is no part of the causation, that defendant is free from liability under the act.

7. Master and Servant—Injury to Servant—Railroads—Contributory Negligence—Federal Employers' Liability Act.—Though an engineer killed in a collision be guilty of negligence in failing to give a signal of the meeting point of the two trains, and in failing to have his train under control as the meeting point is approached, yet where the rules of the company require the conductor to place himself in a position to hear the meeting point signals, and failing clearly to hear and understand them, to stop his train, a recovery may be had under the Federal Employers' Liability Act if the conductor, in the exercise of ordinary care could have known that the decedent failed to give the meeting point whistle, or failed to take steps to stop the train, and could have stopped the train in time to avoid the collision.

8. Master and Servant—Injury to Servant—Railroads—Contributory Negligence—Federal Employers' Liability Act—Evidence.—In an action for damages under the Federal Employers' Liability Act, based on the negligence of a conductor in failing to comply with the rules of the company requiring him to place himself in a position to hear the meeting point signals, and failing to hear and understand them, to stop his train, evidence considered, and held sufficient to take the case to the jury.

9. Master and Servant—Injury to Servant—Railroads—Federal Employers' Liability Act—Verdict Based on Sufficient and Insufficient Grounds—Prejudicial Error.—Since in an action for damages under the Federal Employers' Liability Act, the amount of the

verdict necessarily depends on the amount of negligence attributable to the carrier, a finding based on negligence not authorized by law is prejudicial, even though based also on another and sufficient ground.

HIRAM H. TYE, CHAS. H. MOORMAN, BENJAMIN D. WARFIELD and J. W. ALCORN for appellant.

POPHAM, TRUSTY & ROOSE and J. C. BYRD for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Eugene Heinig was an engineer in the employ of the defendant, Louisville & Nashville Railroad Company. On December 27, 1911, he was killed in a wreck. His widow and administratrix, Catherine D. Heinig, brought this action against defendant to recover damages for his death. The jury awarded damages in the sum of $21,000, which sum was apportioned equally to the widow and six children of the decedent. The defendant appeals.

At the time of the accident Heinig was the engineer in charge of northbound passenger train No. 32, which collided with southbound passenger train No. 33 at Savoy.

The trial court gave to the jury 19 instructions, in which were submitted for its determination the following grounds of negligence:

1.   The meeting point at Savoy was changed without notice to the decedent.

2.   Failure to provide sufficient rules, orders, methods and appliances to make the meeting point of the two trains reasonably safe.

3.   Failure of the employes of southbound train No. 33 to change the switch in time to prevent the collision.

4.   The failure of the conductor to angle-cock the train after the failure of Heinig to indicate by proper signal that he had the meeting point in mind, and intended to stop there.

5.   Failure of defendant to adopt and have in use the block signal system.

In the event it found for plaintiff, the jury was told to state in its verdict under which instruction or instructions its finding was made. In response to this direction, the jury stated that its finding was under instructions Nos. 5, 6 and 12. Instruction No. 5 submitted

the question of the conductor's failure to angle-cock the train. Instruction No. 6 submitted the question of defendant's failure to adopt and have in use the block signal system. Instruction No. 12 defined contributory negligence, and told the jury that, under the Federal Employers' Liability Act, contributory negligence did not defeat a recovery, but simply diminished the amount of the recovery, etc.

The petition also charged that defendant was negligent in permitting the trains to meet at Savoy, because of the topographical conditions there existing; and defendant was further negligent because those in charge of the waiting train No. 33 permitted it to stop too near the switch. These grounds of negligence, however, were not submitted to the jury.

Savoy is a telegraph station about a mile from Williamsburg. There is one switch north of Savoy. About 100 feet south of Savoy is the Pine Mountain Spur main. There are two other switches, Nos. 1 and 2, south of the station next to Pine Mountain Spur. Beginning a few feet south of the station, and extending for a distance of several hundred feet, was another track which had a capacity of about 50 cars. The main track curves at a point a short distance below the south switch of this passing track. There are also some trees and a large embankment near the switch point. Prior to November 29, 1911, the Pine Mountain Spur was used as a passing track at Savoy. On that date the trainmaster issued Bulletin Board Order No. 277, the material parts of which are as follows:

"All concerned:—

"Effective at Noon Monday, December 4th, the tracks at Savoy will be used as follows:

"The track south of depot as a passing siding. This track has a capacity of 50 cars, and derail will be removed from this track.

"Track north of depot and parallel with main line, as a northbound storage, having a capacity of 32 cars.

"Track No. 1, next to Pine Mountain main, as a storage for Pine Mountain cars, this track having a capacity of 49 cars.

"Track No. 2, which is parallel with No. 1, as a storage for southbound loads; capacity 49 cars.

"Derailers have been placed at clearance point on north end of Nos. 1 and 2 tracks."

This bulletin was posted at passenger stations and roundhouse at Corbin and Etowa, at the yard offices at Corbin and Etowa, the general foreman's office at West Knoxville, and at the passenger station at Knoxville. For a portion of the time after this bulletin was posted decedent was running between Marysville and Knoxville. Savoy was not on that line. At the time of the accident decedent had been employed on the main line, where Savoy was located, for a little less than two weeks. He was making his ninth single trip. On each trip he passed by Savoy in the daytime. The rules require the engineer to examine the bulletin board before going out on his trips. There was some evidence to the effect that where the time is not sufficient to apprise trainmen of a change, it is customary to send out a special telegraphic bulletin order. On the day of the accident decedent and the conductor of train 32 received at 31 Order to meet No. 33 at Williamsburg and No. 37 at Rockhold. When the train reached LaFollette the engineer and conductor were each handed a 19 order, directing train 32 to meet train 33 at Savoy. In approaching the switch of the passing track at Savoy it was the duty of the decedent to have his train under control. He did not reduce the speed of the train, but at a point about 500 feet south of the switch was going in the neighborhood of 35 miles an hour. Nor did the decedent blow the meeting signal. When the fireman discovered they were approaching the meeting point he "hollered" to Heinig. Heinig then jumped off his seat and blew three blasts of the whistle and drew off all the air. The purpose of these three blasts was to have the other train back up. It was then too late to stop the train, and there was a front-end collision between it and train 33. There was also evidence to the effect that 33 had just come to a stop about four carlengths from the switch. It had probably stopped for 50 or 60 seconds.

It further appears from the rules of the company that, while both conductors and engineers are responsible for the safety of their trains, and must take every precaution for their protection, the general direction and government of the train is vested in the conductor. He is held responsible for its safe and proper conduct, and the men employed on the train are required to yield willing obedience to his proper orders.

Another rule provides:

"90.  (f) Enginemen of passenger trains approaching sidings at which they are to meet or be passed by trains of the same or superior class, either by schedule or right, or inferior class trains by right, will immediately after sounding the station whistle (Rule 14 (m), give one short sound of the whistle (Rule 14 (a).

"Conductors will place themselves in position to hear these signals, and, failing to clearly hear and understand them, must stop their trains.

"The proper place for enginemen to sound station whistle (Rule 14 (m) is at a point one-half mile from the head block of first passing siding switch."

There was evidence tending to show that the decedent did not blow either the station whistle or the short whistle for the purpose of indicating that he was approaching a meeting point.  There was also evidence to the effect that the conductor did not attempt to angle-cock the train until just about the time of the collision.

Plaintiff also introduced a number of witnesses who testified to the value of the block signal system as a safety device.  This system was in use by a number of roads, and if it had not rendered collisions practically impossible, it had materially reduced the number of accidents of that kind.  This system is used principally in the North.  It is in use on certain portions of defendant's lines.  Perhaps only about ten per cent of the roads of the South use this system.

Though the jury based its verdict on the failure of the defendant to equip its road with the block signal system, and the failure of the conductor to angle-cock the train, we deem it necessary, in view of another trial, briefly to discuss the other grounds of negligence relied on.

1.  With respect to the claim that the meeting point at Savoy was changed without notice to decedent, and that defendant was negligent in not having sufficient rules to give notice to decedent of the change in the meeting point, the following facts appear:  The bulletin making the change in the passing track at Savoy was posted at several places.  Every witness who testified saw it at some one of these places.  At certain of these places it was seen after the accident occurred.  The evidence leaves no doubt that, if the decedent had looked, he, too, would have seen the bulletin.  It is no answer to this proposition to say that his conduct shows that he did

not know of the bulletin. It was his imperative duty to look, and he is charged with knowing that which an examination of the bulletin would have disclosed. The charge that the bulletin was itself indefinite, in view of the conditions existing at Savoy, is more imaginary than real. It is true that there are four tracks south of Savoy. A change was made from the Pine Mountain Spur to the track south of Savoy, which was capable of holding 50 cars. Pine Mountain Spur was thereby excluded. Tracks 1 and 2 adjoining the Pine Mountain Spur were likewise excluded, for they were set apart by the bulletin as storage tracks, and provided with derails. This left only the fourth track, which is the one set apart as a passing track. For the purpose of fitting this up as a passing track certain changes were made. Out of all the witnesses examined in the case, no one claims that the bulletin board order was indefinite, or that he did not clearly understand which track was indicated as a passing track. Furthermore, the 19 order which was handed to the decedent and the conductor of train 32, which changed the meeting point of trains 32 and 33 to Savoy, was clear and explicit, and susceptible of only one construction. The passing track at Savoy having been fixed by the bulletin, the direction to meet at Savoy necessarily meant that the two trains should pass each other on the passing track. Being charged with the duty of knowing that which an examination of the bulletin boards would have disclosed, and with the further duty of knowing the contents of the 19 order, which was clear and explicit, we think it necessarily follows that decedent was not only apprised of the meeting point of the two trains, but that the rules and methods provided for notifying decedent of these facts were reasonably adequate for the purpose intended, and would have been effective had it not been for decedent's failure to exercise that degree of care that a person of ordinary prudence would have exercised under similar circumstances. Instead of following the bulletin board order and the 19 order, and instead of complying with the rules requiring him to give the meeting point signal, and to have his train under reasonable control, decedent approached the passing track with his train going at the rate of 35 miles an hour, and when his attention was called to the necessity of turning in at the passing track, it was then too late for him to avoid the accident.

2.   There was proof that it was customary for the employes of the waiting train to set the switch so that the approaching train could pass on the siding.   It is true that one witness says that the waiting train had stopped for perhaps 50 or 60 seconds when decedent's train approached.   All the circumstances, however, show that the waiting train had just come to a stop.   Certainly it had stopped only for a few seconds.   The statement that it had stopped for 50 or 60 seconds was a mere estimate or guess.   No signal of the approaching train had been given until the train was about 500 feet from the switch.   The engine of the waiting train had stopped about four carlengths from the switch.   The employes of the waiting train, having the right to rely on proper signal of the other train's approach being given, and on the fact that it was under reasonable control, were not required to rush immediately to the switch when they had no reason to anticipate that the other train was so near, or that its speed had not been slackened.   When they were apprised of the approach of the other train, and of the speed at which it was going, that train was about 500 feet away, and it was then an absolute impossibility for them to go two or three hundred feet, as the case might be, and change the switch in time to prevent the accident.

For the same reason there is no merit in the contention that the waiting train stopped too near the switch. It was sufficiently far from the switch to clear an approaching train had it taken the siding, and its employes had the right to anticipate that proper notice of the other train's approach would be given in time to enable them to change the switch.   The waiting train was on the main track at a reasonable distance from the switch. Even if it had been a little further away, it is doubtful if the accident could have been prevented.

3.   Another ground of negligence relied on is that, because of its topographical conditions, Savoy should not have been selected as the meeting place for trains. This position is based on certain evidence to the effect that the switch point of the passing track was near a curve and was obscured to a certain extent by an embankment and trees.   We are unable to perceive how defendant was negligent in the respect indicated.   On a single-track road it certainly conduces to safety to have as many passing tracks as possible.   In rough country, where there are necessarily embankments and trees, it

is not always practicable to place passing tracks out in the open where a clear view may be obtained. Furthermore, the operation of certain trains affects all the other trains on the line, and meeting points of particular trains have to be arranged with regard to other trains. It is, therefore, impossible to fix these meeting points so as to afford an unobstructed view. In addition to these considerations, the topographical conditions were well known to decedent, who had been in defendant's employ for a number of years. Any danger therefrom was known to him, and was necessarily one of the ordinary risks incident to the business in which he was engaged. Furthermore, if the view of the switch point was obscured, and he knew of this fact, there was all the greater reason why he should approach this point with his train under control.

4. By instruction No. 6 the jury were told, in substance, that if they believed from the evidence that for a reasonable time prior to the collision in question the block signal system was in general use on railroads in the United States of like character, in respect to construction and amount of traffic, as that portion of defendant's road complained of, and they further believed that said system was, and was recognized by said railroads and railroads generally, as a device reasonably calculated to prevent collisions of the kind in question, and was used by such railroads for such purpose, and that the use of such block signal at the time and place in question would have prevented the death of Heinig, and that the exercise of ordinary care on the part of defendant for the reasonable safety of its employes in charge of said two trains required the use of said block signals at the time and place in question, and if they further believe that defendant knew, or by the exercise of ordinary care could have known, of such fact a reasonable time before the collision in question, and that defendant's failure to have such block signals, either in whole or in part, caused the collision or the death of Heinig, they should find for the plaintiff. By instruction No. 7 the jury were told, in substance, that if they believed from the evidence that the exercise of ordinary care required the defendant to have block signals, and that the absence of such signals increased the danger of the meeting and passing of said two trains, and if they further believed from the evidence that the increased danger, by reason of the absence of such signals, was

such that a person of ordinary prudence, situated as Heinig was, would not have encountered, and if they further believed from the evidence that on the occasion in question Heinig knew that his train was to meet and pass the other train at the point where the collision occurred, and he also knew of the absence of block signals at such a place, and of the increased danger therefrom, then he assumed the risk of such danger, and the jury should find for the defendant. We deem it unnecessary to discuss the question when or under what circumstances a railroad company is required to adopt the block signal system for the safety of its employes. Here it is admitted that Heinig had been in defendant's employ as an engineer for several years. He was thoroughly instructed in his duties, and passed a creditable examination. It is not shown that defendant was negligent in the operation of the two trains in question, or in the method adopted by it for the operation of trains generally. The means adopted were well known to decedent, and, if obeyed, were reasonably well calculated to secure the safety of employes, including the decedent. There being no Federal Statute requiring railroads to use the block signal system, the common law doctrine of assumed risk applies. Chesapeake & Ohio Railway Co. v. DeAtley, 159 Ky., 687; Seaboard Airline Railway v. Horton, 233 U. S., 492. Decedent knew that the block signal system was not in use by defendant. Being a practical railroad man of long experience, he also knew and fully appreciated the danger growing out of the fact that it was not in use. Under these circumstances, the risk was one that ordinarily and usually attended the business in which he was engaged, and was necessarily assumed by him. As the question is one about which reasonably prudent men can entertain no difference of opinion, the trial court, instead of submitting the question to the jury, should have so held as a matter of law.

5. The next question concerns the conductor's failure to angle-cock the train, and the question whether or not, if he was negligent in this respect, defendant is liable. In the recent case of Pennsylvania Co. v. Cole, 214 Fed., 948, the plaintiff was a rear brakeman and flagman on defendant's eastbound freight train. While his train was standing, about midnight, on the main track to take water, it was run into from the rear by another train consisting of an engine and caboose. The caboose in which plaintiff was asleep was set on fire and plaintiff

thereby severely injured. It was plaintiff's duty to flag the following train, and, instead of doing so, he went to sleep in his own caboose. A recovery was allowed on the ground that the evidence showed that those in charge of the following train could, by the exercise of reasonable care, have discovered the presence of the forward train in time to avoid the collision. In discussing the question, the circuit court of appeals, speaking through Judge Knappin, said:

"But it is strongly pressed upon us that plaintiff's negligence in going to sleep in the caboose while on duty, and thus in failing to flag the following train, was negligence so gross and so proximate in its effect as to preclude all right of recovery. The danger to the interests of the traveling public from failure to enforce such rule is strongly urged. There can be no doubt, at the common law, such would have been the effect of plaintiff's alleged negligence; but the Employers' Liability Act expressly abrogates the common-law rule under which action was barred by the negligence of the plaintiff proximately contributing to the accident and substitutes therefor the rule of comparative negligence. Under this act, no degree of negligence on the part of the plaintiff, however gross or proximate, can, as a matter of law, bar recovery; for, as said in Norfolk & W. Ry.Co. v. Earnest, 229 U. S., 114, 122, 33 Sup. Ct., 654 (57 L. Ed., 1096), the direction that the diminution shall be 'in proportion to the amount of negligence attributable to such employe' means that:

" 'Where the causal negligence is partly attributable to him and partly to the carrier, he shall not recover full damages, but only a proportional amount bearing the same relation to the full amount as the negligence attributable to the carrier bears to the entire negligence attributable to both.' "

In the case of Grand Trunk W. R. Co. v. Lindsay, 233 U. S., 42, the U. S. Supreme Court, speaking through Mr. Chief Justice White, quoted with approval the following language of the Circuit Court of Appeals of the Seventh Circuit:

"If, under the Employers' Liability Act, plaintiff's negligence contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and, if the cause of action is established by showing that the injury resulted 'in whole or in part' from defend-

ant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause and then defeating him, when he could not be defeated by calling his act contributory negligence. For his act was the same act, by whatever name it be called. It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the act." Grand Trunk Western Ry. Co. v. Lindsay, 201 Fed., 844.

In view of the above decisions it cannot be said that the decedent's negligence, even though the proximate cause of his death, was the sole cause of his death, if, as a matter of fact, the conductor, notwithstanding decedent's negligence, could, in the exercise of ordinary care, have known that decedent had failed to give the meeting point whistle, or had failed to take steps to stop his train, and have stopped the train in time to avoid the collision. Rule 90, above set forth, imposes on the conductor the duty of placing himself in a position to hear the meeting point signals, and, failing to clearly hear and understand them, to stop his train. All the witnesses agree that it was the conductor's duty, when the decedent failed to give the meeting point signal, and failed to slacken the speed of his train, to apply the angle-cock and stop the train. We are not disposed to take the narrow view that the rule in question was adopted solely for the protection of passengers, or solely for the protection of employes who were not themselves negligent. It was intended for the protection of the train and everybody on it. It imposes a duty, the breach of which is negligence, and an employe's contributory negligence does not, under the Federal Employers' Liability Act, deprive him of the benefit of the rule where its violation would be negligence as to anyone else on the train. Notwithstanding the fact that decedent's negligence created a condition where the rules required the conductor to act, the accident might have been avoided if the conductor had, under the circumstances of the case, used ordinary care in the application of the angle-cock. The case is not different in principle from that of Pennsylvania Co. v. Cole, *supra,* and we, therefore, conclude that if, as a matter of fact, the conductor was negligent in failing to stop the train, plaintiff may recover, notwithstanding his contributory negligence. On the question of the conductor's negligence, there was sufficient evidence to take the case to the jury.

It follows from what we have said that the case should not have gone to the jury on any other ground than the alleged negligence of the conductor in the respect indicated.

As before stated, the jury based its finding both on alleged negligence of the conductor and the failure of defendant to have in use the block signal system. It may be contended that, as the verdict was proper on one of these grounds, the fact that the jury based its finding on an insufficient ground was not prejudicial. As this action is brought under the Federal Employers' Liability Act, that contention cannot be upheld. That act introduces the rule of comparative negligence. Where the causal negligence is partly attributable to the decedent, and partly to the carrier, his administratrix cannot recover full damages, but only a proportional amount, bearing the same relation to the full amount as the negligence attributable to the carrier bears to the entire negligence attributable to both. N. & W. R. Co. v. Earnest, 229 U. S., 114, 57 L. Ed., 1096. In comparing the negligence of the decedent and the carrier the jury may have concluded that because plaintiff was negligent in one particular, while the carrier was negligent in two particulars, the negligence of the carrier was much greater than that of decedent, and the carrier should, therefore, be required to bear the greater part of the entire loss. Where, therefore, the amount of the verdict necessarily depends on the amount of negligence attributable to the carrier, a finding based on negligence not authorized by law is prejudicial, even though based on another and sufficient ground.

On another trial the court will exclude all evidence bearing on the grounds of negligence other than that of the conductor, and will submit the case to the jury on that ground alone. Instead of leaving the question of decedent's contributory negligence to the jury, the court will tell the jury that decedent was guilty of contributory negligence, and at the same time direct the jury in conformity to the rule laid down in N. & W. R. Co. v. Earnest, *supra,* how to apportion the damages in the event they believe that defendant's conductor was negligent in failing to stop the train.

The foregoing conclusion makes it unnecessary to determine whether or not the verdict is excessive.

Judgment reversed and cause remanded for new trial consistent with this opinion.