# Concannon, Administratrix v. J. L. Strassel Paint & Roofing Company.

(Decided December 1, 1915.)

## Appeal from Jefferson Circuit Court.
## (Common Pleas Branch, Fourth Division).

1. Master and Servant—Negligence—Contributory Negligence.— Where the servant is injured or killed while in the employ of the master, neither negligence on the part of the master nor contributory negligence on the part of the servant will be presumed; the negligence of the former or the contributory negligence of the latter must be established by proof of acts constituting such negligence, or of facts from which it may legitimately be inferred.

2. Master and Servant—Assumption of Risk by Servant—When Doctrine of Applicable.—The doctrine of the assumption of risk rests upon an agreement of the servant with his master, express or implied, from the character or circumstances of his employment, that the master shall not be liable for any injury incident to the service, resulting from a known or obvious danger arising from the nature of the service. Where the servant knows the risk to which he is exposed and appreciates the danger thereof, or the risk is so obvious as that ordinary care upon his part would have enabled him to know it, he will, as a rule, be held to have assumed such risk. He does not, however, assume such risks as are created by the master's negligence, nor such as are latent or are only discovered at the time of the injury. To constitute an assumption of risk knowledge of the risk on the part of the servant must come in time to be of use.

3. Master and Servant—Death of Servant by Falling of Scaffold—Effect of Servant's Knowledge of Unsafe Condition of Scaffold.—Ordinarily, a painter will be regarded as charged with the duty of inspecting a scaffold he is required to use in his work, and of knowing whether its use by him will be safe; but when the scaffold is constructed by his superior in the master's service or under the latter's direction, the servant will not be charged with the duty of inspection, but has the right to assume that his superior has made it reasonably safe for the use he is to make of it, unless the danger of using it was well known to him or so obvious that one of ordinary intelligence and prudence, situated as he was, must or ought to have known the risk. Although the servant may know of defects in an appliance with which he is required to work, or of the danger of making use thereof, if, by the assurance or representations of the master or his superior in the latter's service as to its being safe for use, the servant is lulled into a sense of security and continues the use and is killed by reason of the defects, his personal representative may recover, unless the danger of using it was so obvious, immediate or constant as to be known to the servant, and be nevertheless continued its use.

4.  Master and Servant—Incompetent Fellow Servant—When Master
    Responsible For Negligence of.—The master is bound to the exer-
    cise of due care and diligence in the selection and employment of
    his servants, and if a servant sustains injuries or is killed through
    the incompetence of a fellow servant whom the master or one
    acting for him has been negligent in employing or retaining in
    service, the master may be made liable for such injuries or death,
    if he knew or by ordinary care could have known of such incom-
    petency, and it was unknown and could not, by the exercise of
    ordinary care, have been known to the servant injured or killed.
    The master cannot screen himself from liability upon the ground
    that he did not know of the incompetency of the servant whose
    negligence caused the injury or death, if he might have known
    it by the exercise of reasonable care and caution.

McDERMOTT & RAY and THOMAS J. KNIGHT for appellant.

DODD & DODD for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

James J. Concannon, while in the employ of the ap-
pellee, J. L. Strassel Paint & Roofing Company, and en-
gaged in painting on the interior of a building then being
constructed in the city of Louisville, was thrown to the
floor and killed by the falling of a scaffold upon which he
was at the time standing. His wife, the appellant,
Catherine Cocannon, following her appointment and
qualification as the administratrix of his estate, brought
this action against the appellee to recover damages for
his death, alleging that it was caused by its negligence in
furnishing him a scaffold that was not reasonably safe
for use in the performance of the work required of him,
and in placing upon the scaffold at work with him an
inexperienced and incompetent boy, through whose in-
competency and negligence the scaffold was made to fall;
and, further, that the incompetence of the boy and un-
safe condition of the scaffold were known to appellee at
the time of and prior to the accident, but were unknown
to the decedent.

The answer of appellee specifically denied the acts
of negligence alleged in the petition and pleaded con-
tributory negligence on the part of the decedent. The
plea of contributory negligence was controverted by ap-
pellant's reply. The trial resulted in a verdict for the ap-
pellee, which verdict the jury returned in obedience to a
peremptory instruction from the trial court, given at the

conclusion of appellant's evidence. This appeal is prosecuted from the judgment entered upon that verdict.

The facts furnished by the bill of evidence are few and simple. The decedent was an experienced and capable painter, forty-two years of age, and had at various times been employed by appellee, though his work upon the building where the accident occurred had continued but a few days. On the morning of the day upon which he was killed, he was put at the work of painting the walls on the interior of an apartment of the building, the performance of which work required the use of a scaffold. Fred Hurst, a boy sixteen years of age, was also put at work upon the same scaffold and charged with the duty of puttying nail holes in the walls the decedent was required to paint. The scaffold used by Hurst and the decedent was made of two stepladders with a strong board extending from one to the other, the ends resting upon the rounds of the stepladders; upon this board they were required to stand in doing their work. The board was on the eighth or ninth rounds of the ladders, which fixed its distance above the floor at about eight or nine feet. The board was not nailed or otherwise fastened to either stepladder, nor were the stepladders fastened to the wall of the building. The lower ends of the stepladders rested upon a cement floor, the surface of which was uneven, containing here and there slight depressions. According to the testimony of a number of appellant's witnesses, the scaffold was unsteady, and all of them expressed the opinion that it was unsafe for use. Except from the testimony of the boy, Fred Hurst, it does not appear when or by whom the scaffold was set up, though several of the witnesses said it was customary for the work of setting up and placing the scaffolds to be done by the direction or under the superintendence of appellee's foreman, Deitz. Hurst, after much pressing by counsel for appellant, stated that the scaffold was set up that morning under the direction of Deitz. Early on the morning of the day of the accident the decedent and Hurst did not work together, but were both put to work on the scaffold about an hour and a half or two hours before the accident.

L. O. Porter, a witness for appellant, saw the scaffold fall, and, according to his testimony, it was caused to fall by the act or conduct of Hurst, then standing at one end of the ladder, in reaching out and away from it

puttying nail holes which pushed the ladder near which he was standing out of place and over and caused the plank to slip therefrom and throw both ladders down. The following quotation from the testimony of Porter will better explain what he claimed to have seen:

"It was five minutes to twelve; I was going along taking my bucket down and passed right by and looked up and saw this young fellow leaning out this way, over-reached, and the scaffold commenced shaking and he came down first and Mr. Concannon tried to catch to hold himself and I ran to him when he fell; he had a hand full of putty; he fell on his face like and I went to pick him up and three or four workmen around there said 'no, don't pick him up, let him lay and let the blood run out of his nose and mouth.' "

"Q. Which end of the scaffold fell? A. The south end, the one the boy was on. * * * Q. Do you know what caused this scaffold to fall? A. Reaching out pushed the ladders off."

According to the further testimony of Porter, the decedent, at the time the scaffold fell, was standing on the opposite end from that occupied by the boy, and he was then at work in front of the scaffold, but was not reaching out from the scaffold to perform his work.

Louis Reif, another witness for appellant, testified that he was a carpenter and at work where the accident occurred at the time of its occurrence. He saw the scaffold prior to the accident and when it was in the act of falling, but did not undertake to state what caused it to fall. The boy, Hurst, testified as to the position of himself and the decedent on the scaffold at the time it fell, and its shaky condition. He failed, however, to state that it was caused by his act in reaching out from the end of the scaffold in the manner testified by Porter, and said that he did not know what caused it to fall.

While all of the appellant's witnesses testified that the scaffold as constructed was insecure and in their opinion unsafe, they admitted that it was of the construction and character in common use among the painters of Louisville for the doing of such work as the decedent and Hurst were engaged in at the time the former was killed. Nearly all of the witnesses testified that they saw Fred Deitz, appellee's foreman, in the apartment where the scaffold was in use at various times on the morning before the accident occurred, but only Hurst testified that

he had anything to do with the erection or placing of the scaffold, and the witnesses also agreed that the scaffold was moved from time to time by decedent and Hurst as they would change their place of work.

The appellant rests her right to a reversal upon the single ground that the giving of the peremptory instruction directing the verdict for appellee was error. This contention cannot prevail if it can be said that the evidence shows contributory negligence on the part of the decedent, but for which his death would not have occurred; or that the death resulted from an assumed risk incident to the decedent's employment.

Where a servant continues work with knowledge of the dangers which an ordinarily prudent man would refuse to subject himself to, he is guilty of contributory negligence. On the other hand, the doctrine of the assumption of risk is also dependent upon the servant's knowledge of the dangers incident to his employment. Where he knows, or in the exercise of reasonable and ordinary care should know, the risks to which he is exposed, and appreciates the danger thereof, he will, as a rule, be held to have assumed them. He does not, however, assume such risks as are created by the master's negligence, nor such as are latent or are only discovered at the time of the injury. The doctrine of assumption of risk, unlike that of contributory negligence, rests upon an agreement of the servant with his master, express or implied, from the circumstances of his employment, that his master shall not be liable for any injury incident to the service, resulting from a known or obvious danger arising from the nature of the service. Lex. Ry. Co. v. Cropper, 142 Ky., 39; L. C. & L. R. Co. v. Caven's Admr., 9 Bush, 565; L. & N. R. Co. v. McMillan, 119 S. W., 221; Meade v. Ashland Steel Co., 125 Ky., 114; Cumb. Tel. & Tel. Co. v. Graves, 31 R., 973; Labatt on Master & Servant, vol. 1, sections 270-279.

Negligence on the part of the servant is not to be presumed. Especially is this so where the complaint is that his death resulted from the negligence of the master. Nor will negligence on the part of the master be presumed. Negligence as to either master or servant must be established by proof of the acts constituting it, or of the facts from which it may legitimately be inferred. It is likewise true that in order to charge a servant with assumption of risk he must not only know, but he must

also appreciate the danger to which he is exposed, and one does not voluntarily assume a risk who merely knows that there is some danger, without appreciating it. The mere knowledge of defects in the appliances or place of work, or of other negligence on the part of the master, without knowledge and appreciation of the danger occasioned thereby, will not defeat a recovery, unless the danger is so obvious that the servant cannot help understanding it fully. If, however, the servant has a general knowledge of defects sufficient to charge him with knowledge of danger, he assumes the risk, although he may not know of the particular defect which caused the injury; and where he is injured by a known risk of the employment, assumed by him, it is immaterial that he did not know the precise extent or character of the injury to be sustained. To constitute an assumption of risk knowledge of the risk on the part of the servant must come in time to be of use.

If the only question here presented were whether the scaffold, as constructed, made its use hazardous to the decedent, in view of the evidence as to the obviousness of its defects, we would be constrained to hold that the latter, in making use of it, assumed whatever risks attended or were incidental to such use. But the question indicated is not the only one to be considered. It also appears from the evidence that both the decedent and the boy, Hurst, complained to appellee's foreman of the defective condition of the scaffold and were assured by the latter of its safety, which assurance was coupled with a command to them to continue its use. This is shown by the testimony of Fred Hurst, who, after stating that he was shown the scaffold in question by appellee's foreman, Deitz, and told to get upon it and proceed with the work of puttying nail holes, and that the decedent got upon the scaffold shortly thereafter and continued to work with him thereon until it fell, further testified as shown by the following questions and answers:

"Q. After Mr. Concannon got up on the scaffold and you and he were working there, was anything said by you or by Mr. Concannon to Mr. Strassel's foreman, Mr. Deitz, about the scaffold? A. I went down and told him once and he came back; he told me to go ahead and work it was all right. * * * Q. What did you tell him? A. I told him the scaffolds were shaky. Q. What did he say? A. He said 'Go up and go to work, that scaffold is all

right.' Q. Did you report that to Mr. Concannon?
A. Yes, sir; and he went again. Mr. Concannon said, 'I
will just go myself and report it myself,' and I went
down and told him again and he told me to go up and go
to work again. Q. Who did you tell? A. Mr. Deitz,
and about fifteen minutes after that— Q. This second
time you went down, where was Mr. Deitz?' A. He was
downstairs. Q. Now, what happened after that? A. Sir?
Q. Did you tell Mr. Deitz anything after that before the
accident? 'A. I told him about fifteen minutes after-
wards; I went to him again and he came upstairs with
me at the time I went down and told him the third time,
he came upstairs and went over the scaffold, Mr. Con-
cannon said to him the scaffold ought to be fixed. Deitz
said, 'These scaffolds are all right, go ahead and work.'
Q. What was it Mr. Deitz said? A. 'Go ahead and
work, the scaffold is all right.' Q. What did Mr. Con-
cannon do when Deitz told him the scaffold was all
right. A. Went right to work. Q. What happened
after that? A. Well, along about two minutes of
twelve the scaffold fell over; I could not say how it hap-
pened to go over.''

The foregoing evidence requires the application to
the case of yet another principle of law, viz.: that where
a servant knows of defects in machinery, appliances or
place of work, but is, by the assurance or representations
of the master as to its being safe for use, lulled into a
sense of security and continues the use and is injured by
reason of the defects, he may, nevertheless, recover, un-
less the danger is well known to him, or is so obvious that
one of ordinary intelligence and prudence would, under
the circumstances, refuse to run the risk. The above rule
of law is well recognized in this jurisdiction, and an
elaborate discussion of it may be found in Pullman Co.
v. Geller, 128 Ky., 72, in the opinion of which it is said:

''While the general rule is that the master must pro-
vide the servant with a reasonably safe place to work and
reasonably safe tools (or appliances) with which to work,
if the danger of working in the place or with the tools
(or appliances) provided is so obvious, immediate, or
constant as to be known to the servant, and he neverthe-
less undertakes or continues the work and is injured in
its performance, he cannot recover for such injury, this
rule must, however, be applied with some modification,
if the work is done in an emergency and by the direc-

tion of the master, or by his express command in the
absence of an emergency, and the master gives the serv-
ant to understand that he does not consider the risk one
which a prudent man 'would refuse to undertake, in such
event the servant, notwithstanding his knowledge of the
danger, has a right to rely on his master's judgment,
unless his own is so clearly opposed thereto that, in fact,
he does not rely upon the master's opinion.'' Sunrise
Coal Co. v. McDaniel, 150 Ky., 70; Long's Admr. v. I.
C. R. Co., 24 R., 567; L. & N. R. R. Co. v. Ward, 19 R.,
1900; Shearman & Redfield on Negligence, section 186;
Thompson's Negligence, sections 144-192; C. & O. Ry.
Co. v. Shepherd, 153 Ky., 350.

As there was in this case some evidence which con-
duced to show that the decedent was killed because he
continued to work in a place of danger by direction of
appellee's foreman, upon his assurance that there was
no danger in his use of the scaffold; and, also, some evi-
dence which conduced to prove that the danger of the de-
cedent's continuing at the work after receiving such as-
surance, was not so obvious that he must necessarily
have known of it, the case should have been allowed to
go to the jury. In thus holding we do not overlook the
fact that the painter's relation to the scaffold is like that
of the carpenter to the plane or saw; it is an essential
part of his business, because without it he cannot do his
work, and he ought to be better able than all others to
know when a scaffold is or is not reasonably safe for use.
But while this is true, we cannot say, upon the record
here presented, that, as a matter of law, the decedent was
charged with the duty of inspecting or making safe the
scaffold upon which he worked. The evidence fails to
show that he was charged with any such duty, or that
he had anything to do with the erection or construction
of the scaffold. On the contrary, it shows that the scaf-
fold was put up by Deitz, appellee's foreman, or by his
direction and under his superintendence, and that the
decedent did not see it until he took his place upon it to
begin work, about an hour and a half before it fell
and caused his death.

Our conclusion that the case should have gone to the
jury is fortified by evidence appearing in the record of
another element of risk attending the decedent's use of
the scaffold, which appears to have been wholly unknown
to him, but known to the appellee through its foreman.

We refer to the inexperience and incompetence of the boy, Fred Hurst, who had been in the employ of appellee upon this building but two or three weeks before the accident resulting in the decedent's death. According to the testimony of two of appellant's witnesses, Hurst was not only inexperienced, but both heedless and negligent in the performance of the duties assigned him.  One of these witnesses, L. O. Porter, testified that on two occasions on the morning of the day of the accident and before Hurst began work on the scaffold with the decedent, he fell twice from another scaffold upon which he was at work puttying in another part of the building, and that he heard appellee's foreman, Deitz, shortly before the accident, rebuke Hurst for his carelessness and tell him that he would have to be more careful; that the negligent methods of Hurst were more than once manifested in the presence of Deitz, who would at all times of the day inspect the work going on in the building, and superintend all of the employes engaged therein.

It is apparent from this evidence that the inexperience and incompetence of Hurst were known to appellee through its foreman, Deitz, before Hurst was put upon the scaffold to work with the decedent.  On the other hand, the evidence fails to show any knowledge on the part of the decedent of Hurst's incompetence, or that Hurst ever worked in his presence, but does show that they had never worked together until they were placed on the scaffold an hour or more before it fell and killed the decedent.  In addition to the foregoing evidence in respect to the incompetence of Hurst, appellee's knowledge and the decedent's ignorance thereof, the further uncontradicted evidence, previously referred to, as to the manner in which the scaffold fell, demonstrates that it was caused by the negligent act of Hurst in reaching out from the end of the scaffold to perform the work incident to his employment.

The responsibility of the master for injuries sustained by a servant through the incompetency of a fellow-servant is thus stated in 26 Cyc., 1293:

"The master is bound to the exercise of due care and diligence in the selection and employment of his servants, and if a servant sustains injuries through the incompetency of a fellow-servant whom the master or one acting for him has been negligent in employing or retaining in service, the injured servant may recover for

such injuries unless he knew or should have known of such incompetency."

Again on page 1298, same volume, it is said:

"The mere incompetency of a fellow-servant is insufficient to render the master liable for his negligent acts, in the absence of a showing that the master knew or should have known of such incompetency, and was guilty of negligence in employing him, or in retaining him in the service. But the master must use reasonable diligence in determining the competence of his servants, and if he does or ought to know that a servant is incompetent, he is liable for injuries occasioned by such incompetency, if he has been guilty of negligence in retaining the servant after acquiring such knowledge. * * * The master cannot screen himself from liability upon the ground that he did not know of the incompetency of the servant whose negligence caused the injury, if he might have known it by the exercise of reasonabe care and caution."

In Lawton Sand & Supply Co. v. Stone, 143 Ky., 652, the plaintiff sued to recover of the defendant damages for personal injuries received through the alleged negligence of an inexperienced and incompetent fellow-servant furnished him as an assistant in quarrying stone. The trial court in an instruction told the jury, in substance, that there could be no recovery by the plaintiff in the absence of *gross* negligence upon the part of the defendant in providing plaintiff with an unskilled, incompetent and inexperienced assistant. In condemning the instruction we said:

"This instruction was prejudicial to appellee, as it required the jury to believe from the evidence that appellant was guilty of gross negligence and carelessness in furnishing an assistant to appellee who was unskilled, incompetent and inexperienced. The law in such cases is that if the master is guilty of ordinary negligence the servant should be allowed to recover. As a general rule the master is not liable to a servant who received an injury by reason of the negligence of a fellow-servant, but he is bound to use ordinary or reasonable care in selecting his servants, so if he fails to do this and places an inexperienced or incompetent servant to labor with another who does not know of his inexperience or incompetency, he is liable to the servant if he is injured by reason of the inexperience or incompetency of the other.

Third Thompson on Negligence, 974; Am. & Eng. Ency., vol. 12, 910, and Bell-Coggeshall & Co. v. Lewis, 28 K. Law Rep., 149."

We are clearly of the opinion that the evidence appearing in this case did not authorize the trial court to hold as a matter of law that the decedent's death was caused by his negligence or as a result of any risk assumed by him incident to his employment, or that it was not caused by the incompetency and negligence of Hurst, concurring with appellee's own negligence in keeping him in its employ after discovery of his incompetency. As no evidence was introduced by appellee, we are, of course, unable to foresee what light it will throw upon the cause of the accident resulting in the decedent's death; but the evidence of appellant clearly entitled her to a submission of the case to the jury.

It follows from what has been said that in our opinion the giving of the peremptory instruction directing the verdict for appellee was error. For the reasons indicated the judgment is reversed and cause remanded for a new trial consistent with the opinion.