## Luton Mining Co. v. Louisville & N. R. Co.

Dec. 16, 1938.

GORDON, GORDON & MOORE, ABNER JOHNSTON, JR., and E. M. NICHOLS for appellant.

WITHERS & LISMAN, J. P. HAMILTON, J. MILLER WHITE, ASHBY M. WARREN and H. T. LIVELY for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The trial judge in this case handed down a written opinion containing a finding of law and facts. The facts as contained in this finding appear to us to be so correctly, aptly and concisely stated that we have determined to adopt his finding as the statement of facts for the purpose of this opinion. It is as follows:

"1. About the year 1918, the defendant, Luton Mining Company, made a contract with the Director General of Railroads, and the Louisville & Nashville Railroad Company, for the construction of a switch yard and connection at the coal mine of the defendant, Luton Mining Company, on the plaintiff's Morganfield branch. This contract contained a provision that the mining company would hold harmless the Director General and the railroad company from claims and demands arising directly or indirectly out of the maintenance of said tracks or the operation of rolling stock thereon.

"2. Said track and connection consisted of a railroad switch or turn-out indicated by blueprint accompanying the contract. According to this blueprint, a set-out track parallel to the main line was built upon the railroad company's right-of-way turning off of the switch, and about 550 feet east of the main line, the switch was divided into two tracks passing by the mine tipple and re-uniting beyond it.

"3. In the year 1926, the mining company, because of a fault in the roof of their mine or a break in the seam of coal which it was operating, moved its entry across its switch tracks and a distance of some 350 feet east of the old site in order to enable it to continue working that seam, which made nec-

essary a rebuilding of its switch tracks in order to bring them to and under the new tipple. This new yard extended perhaps 1,000 feet further east than the old yard and none of the new tracks perhaps were on the same line of the old tracks at or near the tipple, but were within a distance of 15 or 20 feet from where the old tracks were located.

"4. About the time this change was made by the mining company the proposition of a new contract was taken up between the mining company and the railroad company, which contract was in all respects similar to the contract under which they had been operating but the president of the mining company wrote the railroad company that inasmuch as the track had already been built and the mining company had paid all of the expenses of building it that he did not consider that a *new* contract was necessary. From the evidence it does not appear whether the railroad company was consulted about these changes or whether its consent was ever given thereto, but it does appear they were made to suit the convenience and the necessities of the mining company and made by it at its own expense.

"5. In June of 1931, M. E. Jagoe, a brakeman employed by the plaintiff as a member of the crew of one of its trains which usually worked this switch yard, was injured by being run over by a moving coal car, which injury happened at an unblocked switch frog. From the evidence it appears that this switch frog was not located closer than 15 or 20 feet to the line where any of the old tracks were located. It also appears that there are more switch frogs in the new yard than there were in the old, for the reason that there are more switch tracks in the new yard than there were in the old. At the time of the accident to Jagoe all of the frogs in this yard were blocked except the one where Jagoe was injured. It appears from the evidence that the train crew was engaged in working this switch for the purpose of removing certain loaded cars therefrom which were consigned to points in Indiana and Tennessee and in placing empty cars to be loaded when the mines should again operate. They were moving a cut of loaded cars coupled together which were being pushed by the engine which was at the

end of the track nearest the main line and in a direction away from the main line. It appears from the evidence that some of the brakes were set on this cut of cars and that Jagoe was attempting to loosen the brake on one of these cars when his foot was caught in the unblocked switch frog and so held that he could not free himself until the car ran over and along his leg injuring it to such an extent that it had to be amputated and that he thereafter died. It appears that he was using a stick or a pole some 5 feet in length in an effort to pry loose a lever or pawl which was holding the brake on that especial car set. The rules of a railroad company require a brakeman to mount the car and release the brake and lever by hand. There was also evidence that this stick had been lying about the yard for some time and had been used by other brakemen on other occasions for the purposes for which Jagoe was using it. The rules of the railroad company prohibited employees from going between moving cars. The evidence discloses that he was walking on the track between two cars which were in motion at the time his foot was caught in this unblocked frog and that the cars were moving at that time about two miles an hour or at about the gait a man would walk.

"6. After Jagoe was injured the railroad company's claim agent investigated the accident and took the statements of a number of witnesses. The railroad company then took the matter up with the mining company, both by letter and by its claim agent and the mining company through its president denied liability on the grounds that Jagoe was contributorily negligent and in a place where he had no right to be, and denies liability either under the contract or otherwise.

"Mr. Jagoe's widow as administratrix, through her attorneys, began negotiations with the railroad company looking toward a settlement of the claim she was making against the railroad company for her husband's death. These negotiations and those between the two companies seem to have been going on concurrently and the railroad company called upon the mining company to co-operate in the matter of settlement which, as above indicated, it de-

clined to do. The claim was then settled by the railroad company by a compromise, by which the administratrix was paid $5,680.00.''

Pursuant to the finding of facts, the trial court found as a matter of law that appellant was liable to appellee for the amount so paid in compromising this claim and judgment was rendered in favor of appellee against appellant for $5,680; from that judgment this appeal is prosecuted. Appellant contends (1) that the lower court erred in overruling its demurrer to the petition; (2) that the alleged contract was without consideration and unilateral; that it was also discriminatory against it and was obtained by coercion on the part of the Director General of Railroads; (3) that there was no liability on the part of appellee to Jagoe's administratrix under the facts of the case and therefore no liability on the part of appellant to appellee; that the railroad company was a volunteer in making this settlement and that the settlement was not made in good faith. We will discuss these propositions in order.

1. Appellant argues vehemently that the petition did not state a cause of action against it by reason of the failure of the petition to allege that the switch track covered by the contract between it and appellant was ever built pursuant to this contract. This alleged defect in the petition is so insistently argued by appellant on account of the fact that it claims there is no actual liability on its part to the railroad company on the merits because of the change and extension of the switch track referred to in paragraph 3 of the finding of facts above set out, it being appellant's contention that as the switch track was not the same as that described in the contract and blueprint attached thereto, and as the accident to Jagoe occurred at a point on the switch track which was not a part of the original switch track described in the contract, there can be no liability on its part to the railroad company.

We are unable to agree with appellant in this contention. The petition as amended alleged that the injury to Jagoe occurred on the twitch track of the mining company and further alleged that the mining company had constructed another track diverging from its load track and running to its tipple. The substitution for the second amended petition sets out fully the facts with reference to the changes in the switch track and, in addi-

tion thereto, the mining company alleged in its answer that the switch track mentioned in the contract was constructed in the year 1918. We regard these changes made by the mining company in the switch track as immaterial insofar as any effect these changes might have on the question of liability here presented. The changes, as indicated in the finding of facts above, merely extended the switch track some distance further than the original track and the parties apparently continued to operate under the contract. These changes were effected by the mining company for its own benefit, probably without the knowledge of the railroad company, and no notice was ever given to the railroad company that the mining company did not regard or consider the extension of the switch track to be covered by the contract. The mining company continued to receive the advantages of the contract as applied to the changes made by it. The company made no claim of coercion or discrimination when the new contract was forwarded to it by the railroad company in 1926, covering the changes made. It made no denial of liability but only stated that it did not see the necessity of a new contract as the changes had already been made. This action on its part was reasonably calculated to lead the railroad company to believe that the mining company acquiesced in the contract and considered that it applied to the changes made in the track. We are therefore of the opinion that the changes did not discharge the contract, were not material, and that the allegations of the petition were sufficient.

2. We find this second contention of appellant to be equally without merit. There is no evidence whatever in the case that any actual coercion was exerted by the Director General of Railroads affecting the execution of this contract. Appellant's theory is that there was a constructive coercion because the railroad company was required to furnish this switch connection under the law, but that in order to obtain it appellant was required to assent to the indemnity provision of the contract.

It has been frequently held that contracts of this type are valid and in no sense contrary to public policy. Gorman Coal Company v. Louisville & Nashville Railroad Company, 213 Ky. 551, 281 S. W. 487; New Orleans Great Northern Railroad Company v. S. T. Alcus & Co., 159 La. 36, 105 So. 91; John Griffiths & Son Com-

pany v. National Fireproofing Company, 310 Ill. 331, 141 N. E. 739, 38 A. L. R. 559.

Appellant's contention that there is no mutuality of obligation in this contract and no consideration for its agreement to indemnify the railroad company overlooks the fact that by this contract the railroad company also bound itself to do things not required by law. The railroad company bound itself for construction of the tracks, if not constructed by the mining company, and this alone, under the authority of Gorman Coal Company v. Louisville & Nashville Railroad Company, supra, was a sufficient consideration to uphold the indemnity provision, the court in that case saying [page 489]:

> "Neither can the second contention of appellant stand. The appellee, by this contract, was not attempting to contract against its common-law liability for negligence. It was simply providing for such liability. As an original proposition, it was not compelled to construct this switch. Therefore the undertakings it entered into with reference to such construction were ample consideration to support the obligations of appellant."

In addition to this obligation assumed by the railroad company, it also apparently undertook to place empty cars on the switch track and take loaded cars therefrom. The language in the contract covering this feature is rather vague and indefinite but, we think, sufficient to show that this obligation was undertaken by the railroad company. It was not required by law to perform this service. The only obligations imposed on it were by virtue of paragraph 9 of section 1 of the Interstate Commerce Act, as amended, 49 U. S. C. A., sec. 1 (9), which provides: "any common carrier subject to the provisions of this act [chapter], upon application of * * * any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any * * * private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of same; * * *."

It is apparent from a reading of this section of the

statute that no duty is imposed upon the railroad company beyond its own right of way. Except for the contract, the mining company would have had the duty and burden of moving empty and loaded cars to and from the switch covered by the contract. The rule announced in Cleveland, C., C. & St. L. Railway Company v. United States, 275 U. S. 404, 48 S. Ct. 189, 72 L. Ed. 338, is not in conflict with the conclusions stated by us, for that case decided only that the railroad company under the section of the Interstate Commerce Act above quoted could be compelled to make the switch connection when demanded by the shipper. We are of the opinion therefore that there was mutuality of contract and that no coercion or discrimination is proven or can be deduced from the contract itself.

3. It seems clear to us that the railroad company was not acting as a volunteer in making the settlement with Jagoe's Administratrix. Regardless of the fact that the mining company might have had a primary liability imposed on it for this accident, nevertheless the railroad company also had this liability imposed on it if there was negligence rendering someone liable to the administratrix. By section 51, 45 U. S. C. A. section 1 of the Federal Employers' Liability Act, the railroad company was liable to Jagoe's estate for the benefit of his widow and infant daughter for "any defect or insufficiency; due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." The railroad company could not divest itself of liability imposed on it by law, whether state or federal law. The obligation was imposed on the railroad company by law to exercise ordinary care to furnish Jagoe a reasonably safe place to work and this was a non-delegable obligation, one that could not be transferred to another by contract so as to relieve the railroad company of this obligation. As said by this court in Ligons Adm'r, v. Evansville Railways Company, 165 Ky. 202, 176 S. W. 968, 971:

"The duty of the master to furnish the servant with a reasonably safe place, material, and appliances in and with which to work cannot be delegated to another. Chesapeake & O. Railway v. Marcum, 136 Ky. 245, 124 S. W. 293; Gulf C. & S. F. Railway Company v. Dorsey, 66 Tex. 148, 18 S. W. 444. In such state of case the person injured may maintain

a joint action against both wrongdoers. Brown v. Coxe Brothers & Co. (C. C.) 75 F. 689." See, also, Interstate Coal Company v. Baxavenie, 144 Ky. 172, 137 S. W. 850; Dasher v. Hocking Mining Company, 6 Cir., 212 F. 628, 129 C. C. A. 164.

As establishing definitely that the railroad company was not a volunteer in making this settlement, we find that the mining company, when notified that the railroad company expected to be indemnified on account of this accident, denied liability under the contract. The letter of August 4, 1931, written by the mining company to the railroad company, contains this language: "We are surprised at the receipt of this communication and in answer thereto we beg to advise you that we are unable to see wherein our company is liable under the contract to which you refer or otherwise." This is a clear repudiation of liability under the contract and this denial of liability is confirmed by the mining company's contention in this case that the contract was not binding and enforcible.

The mining company having denied liability under the contract of indemnity, there seems little question that the railroad company thereupon had the right to exercise a reasonable judgment in settling the case. It seems to be well settled that where the indemnitor in a contract of this kind denies liability the indemnitee may make a settlement of the claim, even though the contract of indemnity provides that the indemnitor will pay only in the event of a judgment rendered against the indemnitee, and even though the contract provides that settlement shall not be made by the indemnitee without consent of the indemnitor. New Orleans Great Northern R. Company v. S. T. Alcus & Co., supra; Butler Brothers v. American Fidelity Company, 120 Minn. 157, 139 N. W. 355, 44 L. R. A., N. S., 609; St. Louis Dressed Beef & Provision Company v. Maryland Casualty Company, 201 U. S. 173, 26 S. Ct. 400, 50 L. Ed. 713. As appellant denied liability under this contract, the railroad company was justified in making a reasonable and prudent settlement of the claim. The only thing remaining to determine is whether or not the railroad company acted in good faith in making the settlement.

Appellant contends that it did not do so and lays great stress on the fact that Mr. Crecelius, Claim Agent

for the railroad company, in talking over the matter with M. K. Gordon, who at that time represented Jagoe's administratrix and who is now one of the attorneys for the mining company, stated that he did not admit liability on the part of the railroad company and contended that it was not liable. We do not attach the degree of importance to this testimony that appellant seeks to have ascribed to it. We can conceive of nothing more natural than that a railroad claim agent, in talking with the attorney for a claimant in a negligence case of this type, would refuse to admit liability on the part of the company. Indeed, we think it would be rather singular to find a claim agent, discussing a case of this character with the opposing attorney, admitting that his company was liable. Our common knowledge and experience tells us that claim agents and attorneys in attempting to settle negligence cases seldom admit to their opponents that there is liability.

But appellant insists that this settlement was not made in good faith by the railroad company, for the reason that there was actually no liability of the company to Jagoe's administratrix, because contributory negligence and assumption of risk on the part of Jagoe would have entitled the company to a directed verdict, or at least to a jury verdict on the trial of the case. This contention is based largely on the fact that Jagoe, at the time he was injured, was walking on the track between two cars which were in motion, this being a violation of a rule of the company; which would have entitled it to a verdict, and on the fact that there is no federal statute requiring frogs to be blocked.

There might be strong logic in appellant's contention in certain types of actions, but it is conceded that an action by Jagoe's Administratrix against the railroad company would have fallen under the provisions of the Federal Employers' Liability Act, 45 U. S. C. A. sec. 51 et seq., and under this Act contributory negligence is not an absolute defense. If it could be said that the failure to have the frog blocked was a violation of the Safety Appliance Act, 45 U. S. C. A. sec. 1 et seq., the defenses of contributory negligence and assumption of risk would not have been available at all. If the action did not fall under the Safety Appliance Act, the doctrine of comparative negligence would have applied. This court, in the case of Louisville & Nashville Rail-

road Company v. Heinig's Administratrix, 162 Ky. 14, 171 S. W. 853, in speaking of contributory negligence as a bar to an action brought under the Federal Employers' Liability Act, 45 U. S. C. A. sec. 51 et seq., said [page 858]:

> "That act introduces the rule of comparative negligence. Where the causal negligence is partly attributable to the decedent and partly to the carrier, his administratrix cannot recover full damages, but only a proportional amount, bearing the same relation to the full amount as the negligence attributable to the carrier bears to the entire negligence attributable to both."

This case further quotes with approval from a number of federal cases as follows: "Under this act no degree of negligence on the part of the plaintiff, however gross or proximate, can, as a matter of law, bar recovery."

It is true that the case of Southern Pacific Co. v. Seley, 152 U. S. 145, 14 S. Ct. 530, 38 L. Ed. 391, and other federal cases cited by appellant, decided that a railroad employee injured by having his foot caught in an unblocked frog was guilty of contributory negligence as a matter of law and could not recover. But these cases were decided under the common law prior to the passage of the Federal Employers' Liability Act in the year 1908. It is also true that there is no federal statute specifically providing for the blocking of frogs as does section 780 of the Kentucky Statutes, but the above quoted language of the Federal Employers' Liability Act makes the railroad company liable for any defect or insufficiency in its tracks. Whether or not this language would be construed to make an unblocked frog negligence in an action under the Federal Employers' Liability Act hardly seems material in view of the Kentucky Statute because, even though the action was under the Federal statute, the railroad company could have been shown to be guilty of negligence by violating this statute of Kentucky. See Frese's Adm'r v. C. B. & Q. Railroad Company, 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131, in which the Supreme Court held, in an action brought under the Federal Employers' Liability Act, 45 U. S. C. A. sec. 1 et seq., that an Illinois statute imposing a duty on an engineer was applicable so that a violation of the statutory duty was negligence on his part operating to defeat his claim. This being so, the

converse of the proposition must necessarily be true, namely, that violation of a state statute imposing a duty on the railroad company for the benefit of employees is actionable negligence.

Appellant is correct in its contention that the Federal Employers' Liability Act does not take away the defense of assumption of risk unless the actionable negligence was a violation of some federal statute. Louisville, H. & St. L. Railroad Company v. Wright, 170 Ky. 230, 185 S. W. 861; Donahue v. L., H. & St. L. Railroad Company, 183 Ky. 608, 210 S. W. 491. However, we cannot agree so readily with appellant's contention that Jagoe must have been held to have assumed the risk incident to this unblocked frog if the case had been tried. The distinction between contributory negligence and assumption of risk is sometimes very difficult to make, although the distinction becomes important in actions brought under the Federal Employers' Liability Act. Donahue v. L., H. & St. L. Railroad Company, supra. As a matter of fact, the case of Southern Pacific Co. v. Seley, supra, cited by appellant, which was decided before the passage of the Federal Employers' Liability Act, held that the plaintiff was barred by contributory negligence, *not by assumption of risk,* from recovering for injuries due to getting his foot caught in an unblocked frog. We are certain that appellant is incorrect in its argument that Jagoe would have been barred from recovery on account of assumption of risk from going in between moving cars. This is definitely not a question of assumption of risk but of contributory negligence. There is, to say the least, room for serious argument that the defense of the railroad company, as to the unblocked frog feature of the case, would have been a defense based on contributory negligence and not on assumption of risk. When the master has failed to provide a safe place to work, assumption of risk by the servant applies only when the servant knows of the master's negligence and the danger therefrom is appreciated by him, 18 R. C. L. 678; Concannon, Adm'x, v. J. L. Strassell, P. & R. Co., 167 Ky. 141, 180 S. W. 86.

These considerations we have discussed with reference to liability or non-liability on the part of the railroad company for the injuries to Jagoe make it apparent that there was at least a grave question confronting the railroad company as to the ultimate outcome of an

action on the claim and under the proof in this case we are unable to say that the railroad company would have been entitled to a directed verdict or that it would have won the case before a jury. But even though it be conceded that the railroad company might possibly have made a mistake in effecting the settlement, that it might have won the case, yet, as indicated above, the only question was whether or not the railroad company acted in good faith. The mining company had denied liability and the railroad company had a right to make a good faith settlement of the claim.

We are convinced there is nothing in the record showing a lack of good faith on the part of the railroad company in making this settlement. It was confronted with a case which might possibly go to the jury and on the trial of which it might have been deprived of all defenses except the defense that Jagoe's injuries were caused solely by his negligence, with the jury left to apply the doctrine of comparative negligence. If the company was liable, this liability extended not only to the pecuniary loss sustained by Jagoe's widow and infant child, but likewise to Jagoe's conscious pain and suffering. Louisville & Nashville Railroad Company v. Jolly's Adm'x, 232 Ky. 702, 23 S. W. (2d) 564.

In determining whether or not the railroad company acted in good faith in paying an amount this large in settlement of the claim, we may draw on our experience and our knowledge of decided cases. When we do this we are convinced that the railroad company did not make an exorbitant settlement but that it acted in good faith and with reasonable prudence.

In view of the foregoing considerations, the judgment of the lower court is affirmed.