844 A.2d 460

**ATLANTIC CONTRACTING & MATERIAL COMPANY, INC.**

v.

**ULICO CASUALTY COMPANY.**

No. 51, Sept. Term, 2003.

Court of Appeals of Maryland.

March 12, 2004.

Reconsideration Denied April 8, 2004.

George Harper, Upper Marlboro, for Petitioner.

Eric R. Stanco of Stanco & Associates, Washington, DC, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and JOHN C. ELDRIDGE, (retired, specially assigned), JJ.

HARRELL, Judge.

On 19 September 2000, Ulico Casualty Company ("Ulico"), Respondent here, filed a complaint in the Circuit Court for Prince George's County against Petitioner, Atlantic Contracting and Material Company, Incorporated ("Atlantic"). The complaint was in response to Atlantic's failure to reimburse Ulico for payments made by Ulico to a claimant under a surety bond and indemnity agreement. The surety, Ulico, had

issued the performance and payment surety bond ("the bond") on behalf of Atlantic, as principal, to guarantee Atlantic's performance of its contractual obligations on a road repair project. Ulico sought to recover monies it paid to Clearwater Hydraulics and Driveshaft Services ("Clearwater") on a claim on the bond, and the attorneys' fees it incurred in pursuing indemnification from Atlantic.

A non-jury trial was held on 14 December 2001. At the conclusion of the trial, the trial judge took the matter under advisement. In a series of subsequent written rulings, the Circuit Court concluded: (a) that only part of the Clearwater claim was covered by the bond and, therefore, Ulico was entitled to reimbursement only for that part of the claim; (b) under the language of the indemnity agreement, Ulico was entitled to recover attorneys' fees, costs, and expenses; and, (c) an award of $5,750 in attorneys' fees, costs, and expenses to Ulico, out of a claim for $16,716.67, was fair and reasonable.

Ulico noted a timely appeal, arguing that it had acted in good faith in paying Clearwater's claim and, therefore, the Circuit Court erred when it did not award Ulico the total sum paid on the bond. In addition, Ulico argued that the Circuit Court abused its discretion in not awarding Ulico the full amount of attorneys' fees, costs, and expenses. Atlantic filed a cross-appeal, asserting that Ulico was not entitled to any part of the amount paid on the bond because the bond did not cover the Clearwater claim. Atlantic also contended that the Proof of Claim form filed by Clearwater was defective, and that Ulico made the payment to Clearwater as a mere volunteer. The Court of Special Appeals, in a reported opinion, *Ulico Casualty Co. v. Atlantic Contracting and Material Co.*, 150 Md.App. 676, 822 A.2d 1257 (2003), reversed the Circuit Court and held that Ulico was entitled to its entire claim. The intermediate appellate court, with regard to Ulico's claim for attorneys' fees, costs, and expenses, remanded for reconsideration in light of its holding as to the error affecting the amount of reimbursement to which Ulico was entitled for paying Clearwater's claim. We granted Petitioner's petition

for writ of certiorari, *Atlantic Contracting v. Ulico*, 376 Md. 543, 831 A.2d 3 (2003), to consider Petitioner's four questions:

1. Do repairs to equipment used on a project constitute "labor and materials" supplied to that project, so as to fall within the coverage of a construction bond?

2. Was Ulico, who sued Atlantic as indemnitor on a bond, a volunteer when Ulico paid a third party when that third party's bill and claim were for repairs to equipment used by the subcontractor defendant, which repairs did not constitute "labor and materials in the prosecution of the work provided for in said subcontract," as were covered by the bond in question?

3. Was Ulico also a volunteer, when the third party's "Proof of Claim" on the bond did not allege that the third party had provided labor and materials to the particular subcontract covered by the bond?

4. Under Maryland law, did the circuit court err or abuse its discretion in awarding attorneys' fees, costs, and expenses to Ulico?

We shall affirm the judgment of the Court of Special Appeals.

I.

A.

On 27 June 1997, Gilbert Southern Corporation ("Gilbert"), as general contractor, entered into a contract with the North Carolina Department of Transportation to repair a segment of the northbound lanes of Interstate 85 ("the project"). Soon thereafter, Gilbert and Atlantic entered into a subcontract for Atlantic to perform the concrete paving work on the project.

Ulico issued a performance and payment surety bond on behalf of Atlantic, as principal, in favor of Gilbert, as obligee. The bond guaranteed Atlantic's performance of its duties under the subcontract and its prompt payment "to all persons supplying [Atlantic] with labor and materials in the prosecution of the work provided for in [the subcontract between

Gilbert and Atlantic] . . . and [the prompt payment of] all other obligations incurred by [Atlantic] in connection with such work. . . ." In connection with the issuance of the bond, Atlantic and its individual owners, John Madden and Thomas Madden, executed a General Agreement of Indemnity and Security ("indemnity agreement"), in favor of Ulico.

Clearwater informed Ulico on 24 June 1998 that Clearwater had billed Atlantic $21,843.48 for repairs to equipment Atlantic was using in connection with the project. Clearwater told Ulico that Atlantic had not paid the bill and that Clearwater was now looking to Ulico, as Atlantic's surety, for payment. In reply, Ulico sent Clearwater a Proof of Claim form with a letter requesting that Clearwater return the form with supporting documentation as verification of its claim.

Clearwater's completion of the Proof of Claim form indicated that Atlantic owed Clearwater $21,843.48 for "repair to equipment used on paving job at I–85 North, Granville County project," and no credits were due to Atlantic. The unpaid bills sent by Clearwater to Atlantic, attached to the Proof of Claim form, were three in number: (1) 5 December 1997 in the amount of $8,299.18; (2) 15 May 1998 in the amount of $7,565.36; and (3) 15 May 1998 in the amount of $4,834.14 (totaling $20,698.68).

Clearwater transmitted the Proof of Claim form and supporting documents to Ulico on 27 August 1998. By then, Atlantic had paid to Clearwater the $4,834.14 bill, by check dated 31 July 1998, which was negotiated by Clearwater on 6 August 1998; however no one informed Ulico of the part payment nor documented the partial payment to Ulico until sometime later.

On 31 August 1998, Cherie Rondinelli, the Bonds Claims Manager for Ulico, wrote to John Madden, President of Atlantic, to inform him that Clearwater alleged it was owed by Atlantic a total of $21,843.48 (comprised of the $20,698.68 represented by the three bills attached to Clearwater's Proof of Claim form, plus interest at 18 percent through 1 August 1998) on the project and asking him to inform Ulico of the

reasons for Atlantic's delay in paying Clearwater. On 3 September 1998, Thomas Madden responded with a terse letter, sent via facsimile transmission and regular first-class mail, stating that Atlantic had sent Clearwater a check for $4,834.14 in partial payment of Clearwater's bills and that the balance remaining was "being disputed and must be resolved prior to completion of payment." Rondinelli responded with a letter, dated 26 October 1998, posing the following questions:

Atlantic continues to state that the balance due is being disputed and will be resolved prior to completion of the project. What is the nature of the dispute? Please provide the surety with documentation of the dispute and amount. Is the project complete, if no, what percentage of the project is complete? When do you expect the project to be complete?

In addition, Ulico requested a copy of the $4,834.14 check that Atlantic purportedly remitted to Clearwater.

On 3 December 1998, having received no response from Atlantic, Rondinelli again wrote to Thomas Madden asking for any documentation supporting Atlantic's dispute of Clearwater's claim. Rondinelli's letter stated in part:

"In order to properly and thoroughly investigate [Clearwater's] claim, it is imperative that the surety receive this information. Atlantic's lack of cooperation with Ulico is placing the surety in a difficult position of possibly having to incur a payment loss on this bond due to the lack of documentation and valid defenses.

"Please consider this as Ulico's SECOND REQUEST for Atlantic to provide the following documentation.

"1. Atlantic continues to state that the balance due is being disputed and will be resolved prior to the completion of the project. What is the nature of the dispute?

"2. Please provide the surety with documentation of the dispute and amount.

"3. Is the project complete, if no, what percentage of the project is complete?

"4. When do you expect the project to be complete?

"5. Please provide the surety with a complete accounting of payments Atlantic received on this project. . . ."

Receiving no response to her 3 December letter, Rondinelli wrote to Thomas Madden again on 29 December 1998. She stated that Ulico had "validated Clearwater's claim of $20,698.62" and "Atlantic's lack of response and documentation [had] placed [Ulico] in a position of incurring a loss [of $20,698.62]." Rondinelli's letter demanded that Atlantic pay Ulico that sum within 5 working days of receipt of the letter or Ulico "would be forced to seek other restitution via its rights under the indemnity agreement." This letter was sent to Atlantic by certified mail. Ulico, on 4 January 1999, delivered its check to Clearwater for $20,698.62, and received in return Clearwater's assignment of its claim against Atlantic and a release of Ulico from all liability under the bond.

By a letter of 5 January 1999, which was transmitted to Ulico by facsimile at 4:50 p.m. that day and sent also by certified mail, John Madden responded to Ulico stating that the dispute over Clearwater's bill was "predicated on the fact that unauthorized work was performed and billed for" and that the invoices Atlantic received from Clearwater totaled $15,864.54, not $20,698.62. Attached to the letter were copies of the disputed invoices and Atlantic's canceled check to Clearwater, for $4,834.14. Madden complained he had left telephone messages on Rondinelli's voice mail on 11 December 1998 and 5 January 1999 that had not been returned and directed Ulico not to make any payment to Clearwater. Subsequently, Atlantic refused to reimburse Ulico.

### B.

As noted above, Ulico filed a complaint in the Circuit Court for Prince George's County. From Atlantic, Ulico sought to recover under the indemnity agreement the $20,698.62 it had paid Clearwater, plus interest, attorneys' fees, costs, and expenses.

The case was tried to the bench on 14 December 2001. John Madden testified on behalf of Atlantic. Madden stated

that Clearwater had not supplied labor or materials for the project for Atlantic. Rather, Clearwater performed repair work on some hydraulic motors for a "CMI concrete belt placer" machine that Atlantic was using on the project. Madden testified that the belt placer machine belonged to Atlantic, had a useful life of 10 or 15 years, was not dedicated to the project, and had been used on several other projects. Madden further testified that Atlantic paid only $4,834.14 of the total amount billed by Clearwater because the unpaid balance was for materials, mostly pumps, that were not received by Atlantic and which had been obtained fraudulently by one of Atlantic's former employees in a collaborative scheme with one of Clearwater's employees.

The Circuit Court penultimately noted that Maryland's appellate courts had not yet specifically addressed in a reported opinion the issue of whether repairs to previously owned equipment constituted "labor and materials" under a surety bond for payment and performance. Thus, the trial judge relied on federal court decisions addressing the issue in the context of contracts on federal construction projects. He summarized the federal cases as holding that, "repair parts, appliances, and accessories which add materially to the value of the equipment and render it available for other work [than the project covered by the bond] are not within the coverage of the payment bond." *See, e.g., Continental Cas. Co. v. Clarence L. Boyd, Co.*, 140 F.2d 115, 116 (10th Cir.1944) (citations omitted). The trial judge concluded that repairs to equipment used by a subcontractor that materially enhance the value of the equipment by making it available for jobs other than the project covered by the surety bond are not payments within the scope of the bond. By contrast, repairs to a subcontractor's equipment incidental to carrying on the particular project covered by the bond, but which do not add to the value of the equipment, are covered.

The Circuit Court found that the repairs made by Clearwater to Atlantic's equipment added to the value of that equipment. In particular, the court found that

Clearwater did not charge for incidental items consumed in completion of the project such as gasoline, oil, filters, etc. Clearwater supplied parts and accessories that added to the value of the machinery, they were not incidental and inexpensive in character and therefore are not covered by the bond. As to the labor charges, Clearwater's bills attached to the Proof of Claim form provided to [Ulico] outline $3,234.00 in unpaid labor costs. Such costs aided in the completion of the I–85 project covered by the Bond and therefore are recoverable by the [Ulico] along with interest at the legal rate of 6% accruing from the date of payment to Clearwater, December 31, 1998, in the amount of $614.46.

Finally, the Circuit Court held that Ulico's "payment of the claim made by Clearwater, although made in good faith, was not entirely included in 'labor and materials' as covered by the bond. Defendant cannot be held liable for all of those costs, only the cost of labor." Ultimately, the Circuit Court concluded that, under the indemnity agreement, Ulico was entitled to recover attorneys' fees, costs, and expenses only in the amount of $5,750.

### C.

In the Court of Special Appeals, as noted earlier, Ulico argued that the Circuit Court erred in not awarding Ulico the total sum Ulico paid to Clearwater because Ulico made the payment in the absence of fraud and in good faith. In addition, Ulico asserted that the Circuit Court erred in not awarding it the full amount of attorneys' fees, costs, and expenses incurred in pursuing recovery from Atlantic. In a cross-appeal, Atlantic argued that the Circuit Court erred in awarding Ulico any part of the payment made to Clearwater because Clearwater's work was not covered by the bond, or because the Proof of Claim form filed by Clearwater was defective, and, in any event, Ulico made the payment as a volunteer.

The Court of Special Appeals held that under the good faith clause in the indemnity agreement:

Ulico was entitled to reimbursement from Atlantic for a claim Ulico paid in good faith, without fraud, regardless of whether Ulico was actually liable for the claim—either by virtue of a defense of Atlantic to the claim or by virtue of the claim's being outside the scope of the Bond. Accordingly, once the trial court found that Ulico acted in good faith and without fraud in paying Clearwater's claim, it should have awarded Ulico reimbursement for its full payment on the claim.

*Ulico Cas. Co. v. Atlantic Contracting and Material Co.*, 150 Md.App. 676, 698, 822 A.2d 1257, 1270 (2003). Accordingly, the intermediate appellate court reversed the Circuit Court's judgment and remanded the case "1) for the court to award Ulico as damages the full amount it paid to Clearwater on the Clearwater claim; and 2) for the court to reconsider Ulico's contractual claim for attorneys' fees, costs, and expenses."

## II.

### A.

First, we shall reiterate our understanding of the fundamental principles governing surety bond and indemnification relationships. A surety bond is a three-party agreement between a principal obligor, an obligee, and a surety. *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 259, 492 A.2d 1306, 1309 (1985). In a performance bond context, the surety assures the obligee that if the principal fails to perform its contractual duties, the surety will discharge the duties itself, either by performing them or paying the obligee the excess costs of performance. *Id.; United States Fid. & Guar. Co. v. Feibus*, 15 F.Supp.2d 579, 580 (M.D.Pa.1998), *aff'd*, 185 F.3d 864 (3d Cir.1999) (affirmed without reported opinion). In a payment bond, the surety guarantees the principal's duty to the obligee to pay its (the principal's) laborers, subcontractors, and suppliers. *Feibus*, 15 F.Supp.2d at 581 n. 2.

The liability of a surety is coextensive with that of the principal. *Gen. Builders Supply Co. v. MacArthur*, 228

Md. 320, 326, 179 A.2d 868, 871–72 (1962) (citations omitted). The surety is primarily or jointly liable with the principal and, therefore, is immediately responsible if the principal fails to perform. *Gen. Motors Acceptance Corp.*, 303 Md. at 259, 492 A.2d at 1309. Ultimate liability, however, is with the principal, not the surety. *Id.* Upon default of the principal, the surety may pay the money and proceed against the principal for indemnity. *Dixon v. Spencer*, 59 Md. 246, 248 (1883). The bond is the measure of the surety's obligation. In the construction industry, it is standard practice for surety companies to require contractors for whom they write bonds to execute indemnity agreements by which principals and their individual backers agree to indemnify sureties against any loss they may incur as a result of writing bonds on behalf of principals. *See generally The Surety's Indemnity Agreement—Law & Practice* (Marilyn Klinger, *et al., eds.*, Am. Bar Assoc. 2002).

The seeming threshold legal issue in the present case is whether Ulico was entitled to reimbursement for any of Clearwater's repair bills that assertedly were not covered by the bond. Although we reach the same result as the Court of Special Appeals, we conclude that the sweep of its analytical construct, that a surety, in paying a claim, acting in good faith and without fraud, is entitled to indemnity under the indemnity agreement regardless of whether the claim on the bond is covered actually by the bond, neglects some important factors that to us seem necessary to the paradigm.

To start, the analysis of a surety bond and indemnity agreement ordinarily should examine the bond's coverage in conjunction with liability and good faith under the indemnity agreement. "A surety bond is a contract and is to be construed as such." *John McShain, Inc. v. Eagle Indem. Co.*, 180 Md. 202, 205, 23 A.2d 669, 670 (1942) (citations omitted). The indemnity agreement and surety bond, being written contracts, must be construed in accordance with our traditional rules of objective contract interpretation. "The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an

appellate court." *Wells v. Chevy Chase Bank,* 363 Md. 232, 250, 768 A.2d 620, 629–30 (2001) (citations omitted). In determining the meaning of contractual language, Maryland courts apply the principle of the objective interpretation of contracts. *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC.,* 376 Md. 157, 166, 829 A.2d 540, 546 (2003), and cases there cited. Applying objective interpretation principles, the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean. *Ashton,* 354 Md. at 340, 731 A.2d at 444; *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298, 304 (1996). Our primary consideration, when interpreting a contract's terms, is the "customary, ordinary, and accepted meaning" of the language used. *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.,* 324 Md. 44, 56–57, 595 A.2d 469, 475 (1991) (citations omitted). The terms of the contract must be interpreted in context, and given their ordinary and usual meaning. *Langston v. Langston,* 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001).

Contract interpretation "involves discerning the terms of the contract itself." *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194, 199 (2001) (citations omitted). In an action which presents an issue of coverage under a surety bond and liability under an indemnity agreement, "it is the function of the court to interpret the policy and decide whether or not there is coverage. If such a coverage issue depends upon language of the policy which is ambiguous," we will resolve that ambiguity in favor of the insured. *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 194, 438 A.2d 282, 286 (1981). In the light of the aforegoing precepts, and bearing in mind that the payment bond in the instant case was executed for the purpose of guaranteeing the performance of a private contract, it is incumbent upon us to ascertain from the payment bond and indemnity agreement the intention of the parties. *Levy v. Glens Falls Indem. Co.,* 210 Md. 265, 273, 123 A.2d 348, 351 (1956) ("The cardinal rule in the interpretation of bonds, as in the interpretation of all written contracts, is to ascertain the intention of the parties and to give effect to

that intention if it can be done consistently with legal principles."); *see also Lange v. Bd. of Educ.*, 183 Md. 255, 260, 37 A.2d 317, 320 (1944); *Hosp. for Women of Maryland v. United States Fid. & Guar. Co.*, 177 Md. 615, 618, 11 A.2d 457, 459 (1940).

The coverage of the bond in the present case extended to "payment to all persons supplying the Principal with labor and materials in the prosecution of the work provided for" in the subcontract between Atlantic and Gilbert. Clearwater's claim was for "repair to equipment used on paving job at I–85 North, Granville County project." In the indemnity agreement, Atlantic promised to "indemnify [Ulico] from and against any and all Loss" and, to that end, to "promptly reimburse [Ulico] for all Loss." The indemnity agreement defines 'Loss' to mean:

> Any and all damages, costs, charges, and expenses of any kind, sustained or incurred by [Ulico] in connection with or as a result of: (1) the furnishing of any Bonds; and (2) the enforcement of this Agreement. Loss shall also include any funds disbursed by [Ulico], or arranged for or guaranteed by [Ulico] for the use and/or benefit of any indemnitor.

Atlantic further agreed in the indemnity agreement that

> (1) originals or photocopies of claim drafts or payment records kept in the ordinary course of business ... shall be prima facie evidence of the fact and amount of such Loss; and (2) [Ulico] shall be entitled to reimbursement for any disbursements made by it in good faith, under the belief that it was liable, or that such disbursement was necessary or prudent.

In addition, Atlantic promised to deposit with Ulico on demand any reserve against loss that Ulico required or deemed prudent to establish, "whether on account of actual liability or one which is, or may be asserted against it whether or not [Ulico] has made any payment therefore[,]" and to grant Ulico a security interest in certain pieces of its equipment.

Atlantic argues that despite the indemnity agreement, the work performed by Clearwater was not covered by the bond

because Clearwater provided 'parts and service' for Atlantic's equipment. Atlantic contends that these 'parts and service' repairs made by Clearwater were not 'labor and material' for the project because the equipment in question was not bought for exclusive use on the project and because the life expectancy of the equipment extended beyond that of the project. Based on a review of our cases and persuasive federal precedents, we would conclude, were this the dispositive issue in the present case, that repairs to equipment that add materially to the life of the equipment and extend the equipment's useful life beyond the life of the project do not constitute 'labor and materials' supplied to the project, so as to fall within the coverage of the bond.

We have not directly addressed the issue of whether repairs to permanent equipment are 'labor and materials' for an individual project before, but we came close to resolving the issue in the analogous case of *Williams Construction Co. v. Construction Equipment, Inc.*, 253 Md. 60, 251 A.2d 864 (1969). In *Williams*, the principal, Williams Construction Company ("Williams"), arranged for a payment bond with the surety, Fireman's Fund Insurance Company ("Fireman's Fund") for a bridge project. *Williams*, 253 Md. at 61–62, 251 A.2d at 865. The payment bond for the bridge project provided:

> "[T]he condition of this obligation is such that if the [Principal] shall promptly make payments to all persons supplying labor and/or material to the Principal and to any Subcontractor of the Principal or any Subcontractor of the Principal in the prosecution of the work provided for in said Contract * * * then this obligation shall be void. . . ."

*Id.* The equipment for the bridge project was leased from a leasing company. The leasing company incurred charges totaling $32,578.02 that were not paid and sued Williams and Fireman's Fund. All of this amount was for equipment rental or for haulage or repair of the leased equipment, except for a charge of $46.95 for carbide bits and covered wire, which appear to have been materials used on the job. *Williams*, 253 Md. at 62 n. 3, 251 A.2d at 865 n. 3.

When the case reached this Court, we concluded that the circuit court should have directed a verdict for Williams and Fireman's Fund "with respect to $32,481.07 of the total amount in controversy, this being the aggregate amount of charges for equipment rental and haulage and repair." *Williams,* 253 Md. at 69, 251 A.2d at 869. In addition, the circuit court "should have permitted the case to go to the jury as to the remaining amount of $46.95, this being the charge for materials delivered to the job site, because it appeared to be conceded that this amount was recoverable under the bond." *Williams,* 253 Md. at 69–70, 251 A.2d at 869.

The conclusion reached in *Williams* relied on our reasoning in *State for use of Gwyns Falls Quarry Co. v. National Surety Co.,* 148 Md. 221, 224–25, 128 A. 916, 917 (1925), where we resolved that renting a steam shovel was not furnishing labor or materials for a particular project under a contractor's bond:

The steam shovel leased by the appellant in this case was merely an implement utilized by the lessees in the work for which they were employed. It formed a part of their equipment for the business in which they were regularly engaged. The monthly rent accruing to the appellant was payable regardless of the extent to which the steam shovel was actually used or of the place where it was operated. The appellant's claim is obviously not for labor performed on the highway, since the work in which the leased machine was used on the road was done exclusively by the lessee, and we think it also clear that the use and depreciation of the steam shovel, and its transportation to the appellant, should not be regarded as materials furnished in the construction of the roadway, within the terms of the contractor's bond. . . .

Relying on this reasoning, we held, in *Williams,* that charges for equipment rentals are not recoverable under a payment bond as 'labor and materials.' *Williams,* 253 Md. at 69–70, 251 A.2d at 869. Just as the leased equipment and its repair was not covered by the payment bond in *Williams,* it would seem that repairs to Atlantic's equipment in the present case would not be covered. Like the steam shovel, Atlantic's

concrete belt placer was merely an implement utilized by Atlantic in the work for which it was employed. Atlantic's concrete belt placer formed a part of its equipment for the business in which it regularly was engaged. The repair bill was payable by Atlantic regardless of whether Atlantic's concrete belt placer actually was used on the project.

In federal construction projects, federal courts that have addressed the same issue held that "repair parts, appliances, and accessories which add materially to the value of the equipment and render it available for other work are not within the coverage of the payment bond." *Continental Cas. Co. v. Clarence L. Boyd Co.*, 140 F.2d 115, 116, (10th Cir.1944) (citing *Maryland Cas. Co. v. Ohio River Gravel Co.*, 20 F.2d 514 (4th Cir.1927); *United States to use of Galliher & Huguely, Inc. v. James Baird Co.*, 73 F.2d 652 (D.C.Cir.1934)). In *Maryland Casualty*, a claim was made under a bond by a garage that provided labor, gas, oil, an engine, and tires for trucks of a contractor working on a state road construction project. All of the items were furnished for trucks that were used on the work of the contractors on the road project. *Ohio River*, 20 F.2d at 518. The Fourth Circuit Court of Appeals noted that there is a "well recognized rule that a bond such as this does not cover machinery and equipment used by the contractor in carrying on the work, or repairs to such machinery and equipment." *Id.* Despite this general rule, the Fourth Circuit went on to note that some items used on permanent equipment may still come within the scope of the bond. In a particularly well reasoned passage, the Fourth Circuit analyzed how repairs and materials for permanent equipment owned by the contractor may or may not be covered by a bond for a specific project:

"It is undoubtedly true that repairs which add materially to the value of the equipment and render it available for other work are no more within the protection of the bond than the equipment itself; and one, for instance, who supplies a tire or a motor for a truck is no more entitled to recover under the bond than one who furnishes the truck itself. On the other hand, there are repairs of an incidental

and inexpensive character, such as most of those embraced in the account seem to have been, which do not in any true sense add to the value of the equipment, but are incidental to the carrying on of the work and represent merely ordinary wear and tear or its equivalent. The labor done in making such repairs is in reality labor done in the carrying on of the work, and we think should be treated as such. Thus a blacksmith who sharpens the plows and drills or repairs the carts used in making an excavation would undoubtedly be protected in the same way as other laborers, and we see no difference between his case and that of a mechanic who keeps in repair and running condition a fleet of trucks used on the job. The labor of such a one adds to and becomes a part of the finished structure just as truly as does the labor of one who wields a pick or shovel. And, of course, granting the principle, it can make no difference whether the mechanic does the work at the scene of the operation or in his own garage. We think that those items of the account which represent mere incidental repairs upon the trucks used on the job necessary to keep them in running condition for the performance of the work, should have been allowed as being within the protection of the bond.

"We think, too, that claimant is entitled to recover for the gasoline and oil furnished for use in operating the trucks." *Id.* (citations omitted).

If the reasoning employed by the Fourth Circuit were applied to the facts in the present case, it would seem the Circuit Court was correct, as far as it went, because the repairs made by Clearwater to Atlantic's equipment added to the value of that equipment and, thus, were not 'labor and materials' covered by the bond. Nonetheless, Atlantic is not entitled to be declared the victor in this litigation. Ulico did not know the facts supporting this coverage defense at the time of its settlement of the claim with Clearwater because Atlantic had not informed Ulico timely or adequately of the underlying facts, though requested to provide such information.

While a number of jurisdictions apply a constrained standard of good faith/absence of fraud analysis in determining whether a surety is permitted to enforce an indemnity agreement against the indemnitor, several jurisdictions include in their assessment of the surety's actions in settling or paying a claim in good faith a criterion of reasonableness. *Lumbermens Mut. Cas. Ins. Co. v. Darel Group U.S.A., Inc.*, 253 F.Supp.2d 578, 585 (S.D.N.Y.2003) ("New York courts have upheld [indemnity agreement] provisions, and payments made by sureties under such provisions are scrutinized only for good faith and reasonableness as to amount paid.") (citations omitted); *The Hartford v. Tanner*, 22 Kan.App.2d 64, 910 P.2d 872, 881 (1996) ("we agree with those cases that hold that the implied covenant of good faith requires a surety seeking indemnification to show that its conduct was reasonable"); *Hawaiian Ins. & Guar. Co. v. Higashi*, 67 Haw. 12, 675 P.2d 767, 769 (1984) ("Even if an indemnitee has a legal right to settle a claim, the settlement must be reasonable and made in good faith."); *J.F. White Engineering Corp. v. General Ins. Co.*, 351 F.2d 231, 233 (10th Cir.1965) ("while [the surety] was not required to permit the contractor to complete the contract, if it believed that in the exercise of reasonable diligence and precaution [the principal] ... should have been employed to complete the project, the jury should reduce or deny recovery in the amount which it believed could have been saved by so doing"); *Nat'l Sur. Corp. v. Peoples Milling Co.*, 57 F.Supp. 281, 283 (W.D.Ky.1944) ("If the surety or the indemnitee has the legal right to adjust or settle the claim, either by reason of the terms of his contract or because of actions on the part of the indemnitor, it is only necessary that such an adjustment or settlement be a reasonable one and made in good faith."); *Luton Mining Co. v. Louisville & N.R. Co.*, 276 Ky. 321, 123 S.W.2d 1055, 1062 (1938) (surety is justified in settling claim when "it acted in good faith and with reasonable prudence"); *see generally* Bruner & O'Connor, 3 Construction Law § 10:107 (2003) (*Reasonableness v. Good–Faith Standards*).

In the present case, the Court of Special Appeals was persuaded by *Fidelity & Deposit Co. v. Bristol Steel & Iron*

*Works, Inc.,* 722 F.2d 1160 (4th Cir.1983), in concluding that when a good faith standard is applicable to the surety's performance, the only issue is whether fraud was present. Under this analysis, a bond coverage issue raised by the principal would, therefore, be irrelevant to the analysis. The effect of this, in those jurisdictions that recognize only a narrowly applied good faith standard, is that the test is not whether the surety "was negligent in spending too much money in completing the construction contract," *English v. Century Indemnity Co.,* 342 S.W.2d 366, 369 (Tex.Civ.App. 1961), nor if the principal alleged lack of diligence, *Continental Casualty Co. v. American Security Corp.,* 443 F.2d 649 (D.C.Cir.1970); *Engbrock v. Federal Insurance Co.,* 370 F.2d 784, 787 (5th Cir.1967), negligent ignorance, *Ford v. Aetna Insurance Co.,* 394 S.W.2d 693 (Tex.Civ.App.1965), or even a mistake of law made by the surety in making the disbursement, *Central Surety & Insurance Corp. v. Hinton,* 233 Mo.App. 1218, 130 S.W.2d 235, 242 (1939); instead, the test is whether the surety committed fraud in making payment. We conclude that a good faith standard that protects the surety for every mistake no matter how egregious, that falls short of fraud, is unwise. *The Hartford v. Tanner,* 22 Kan.App.2d 64, 910 P.2d 872, 881 (1996) ("Allowing the surety's indemnification to be enforced, absent fraud, leaves the principal and indemnitor at the mercy of the surety's unreasonable conduct.") (citation omitted). We conclude rather that a standard of reasonableness also should be implied in the good faith analysis of a surety's actions in determining whether it may recover against the principal.

 In a three-way relationship between a surety, an obligee, and a principal, the reasonable expectations of all the parties must be effectuated and the surety must act in a reasonable manner in handling or paying claims. We find the reasoning in *City of Portland v. George D. Ward & Associates, Inc.,* 89 Or.App. 452, 750 P.2d 171, 175 (1988), to be persuasive:

> Parties to an indemnity agreement which subjects the right to compromise a claim against the principal to the sole

discretion of the surety must reasonably expect that compromise and payment will be made only after a reasonable investigation of the claims, counterclaims and defenses asserted in the underlying action. In order to prove lack of good faith in settling the claim, [the indemnitors] needed only prove that [the surety] acted for dishonest purposes or improper motives.

*Id.* In the present case, we do not substitute a reasonableness standard for the good faith standard; we simply have equated the two standards, as the court does in *City of Portland.* We hold that the good faith standard allows the surety a discretion limited by the bounds of reasonableness, rather than by the bounds of fraud.

We disagree with the Court of Special Appeals' narrow reading of the good faith clause in the indemnity agreement here that effectively renders the terms of the bond nugatory and could permit a surety, under circumstances different from those in the present case, to be indemnified for payment of claims that may be outside the scope of the bond. We think that, in the present case, the factors to be considered in determining whether a surety made a reasonable, good faith settlement under the terms of the bond and the indemnity agreement are the following: (1) the obligations of the surety as provided by the terms and coverage of the bond, *Commercial Union Insurance Co. v. Melikyan,* 430 So.2d 1217, 1222 (La.Ct.App.1983); (2) whether the principal has made more than generalized demands that the surety deny the claim, *Glens Falls Indemnity Co. v. Carobine,* 36 N.Y.S.2d 253, 255 (N.Y.City Ct.1942); (3) the cooperation, or lack thereof, by the principal, in dealing with the surety, *Id.*; (4) the thoroughness of the investigation performed by the surety, *Maryland Casualty Co. v. R & L Construction Co.,* 368 S.W.2d 134, 136 (Tex.Civ.App.1963). *See, e.g.,* Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks,* 22 Tort & Ins. L.J. 133 (1986) (enumerating a host of factors considered by courts in determining whether the surety has performed or settled in good faith).

In the present case, the Court of Special Appeals held that the coverage of the bond was irrelevant, and that the terms and coverage of the bond did not control the indemnity agreement. The Court of Special Appeals reasoned that

> The pertinent language does not say (as it could have said) that, for the surety to be entitled to reimbursement, the expense or cost it incurred must be covered by or within the scope of the Bond. Rather, it says that the surety must have incurred the expense or cost "in connection with or as a result of . . . the furnishing of" the Bond. In the context in which the phrases "in connection with" and "as a result of" are used, they connote "with relation to" or "as part of." An expense or cost can be incurred or paid by a surety "in connection with . . . the furnishing of" or "as a result of . . . the furnishing of" the bond, notwithstanding that there will never be a determination whether the claim in fact was with the scope of the bond.

*Ulico*, 150 Md.App. at 693–94, 822 A.2d at 1267.

We, however, perceive a difference between coverage and liability. The words of the bond are not mere surplusage, they must be read in conjunction with the indemnity agreement. We have said that "a bond is to be construed in connection with the contract whose performance it secures." *State Highway Admin. v. Transamerica Ins. Co.*, 278 Md. 690, 700, 367 A.2d 509, 516 (1976) (citing *Lange v. Bd. of Educ.*, 183 Md. 255, 260, 37 A.2d 317, 320 (1944)). We think too that an indemnity agreement is to be construed in conjunction with the bond upon which it is based. Contractual terms cannot be read out of the agreement altogether, and the meaning of a provision is not discerned by reading it in isolation, but by recognizing its relation to the other terms of the complete contractual relationship. *See Goldberg v. Goldberg*, 290 Md. 204, 213, 428 A.2d 469, 475 (1981). In *Jones v. Hubbard*, 356 Md. 513, 534–35, 740 A.2d 1004, 1016 (1999), we discussed the need for accounting for all the relevant contract provisions:

Implied in this [objective] test is that the interpretation of the language is to be of the entire language of the agreement, not merely a portion thereof. This implication was demonstrated by the Court of Special Appeals in *Shanty Town Assocs.* [*Ltd. Partnership v. Dept. of Environment*], 92 Md.App. 103, 607 A.2d 66 [(1992)]. In that case involving the interpretation of a consent judgment, the court implied that one needs to read the complete language of a consent judgment to determine its purpose. Thus, to understand the true meaning of a consent order, the language of the judgment must be "read as a whole." *Id.* at 114, 607 A.2d at 71. "The entire judgment—all provisions considered—should be read as a whole in the light of all the circumstances as well as of the conduct of the parties." *Hanson v. Hearn,* 521 So.2d 953, 955 (Ala.1988). "When interpreting a consent decree, or any other agreement, words must be read in context. The decree must be read as a whole, each of its provisions being interpreted together with its other provisions." *Westinghouse Air Brake Div. v. United Elect.,* [*Radio & Mach. Workers of America*] 294 Pa.Super. 407, 414, 440 A.2d 529, 533 (1982). "An interpretation of the judgment that gives meaning according to its entirety is favored over one that makes some part of it mere surplusage." *Hanson,* 521 So.2d at 955.

 Reading the payment bond and indemnity agreement together, if a surety unreasonably pays for an obligee's work that is not covered under a payment bond, then the surety should not be entitled to indemnification from the principal, without further ado, under the good faith provision in the indemnity agreement. In the present case, however, the undisputed facts indicate that the surety reasonably paid Clearwater in good faith. Atlantic did not inform the surety in a timely fashion of its contention, or supporting facts, that the bond did not cover the work performed by Clearwater. On its face, the completed Proof of Claim indicated that Clearwater's work was part of the project and covered by the bond. Ulico informed Atlantic of the claim and repeatedly asked for clarification in the form of receipts and information

as to why Clearwater's claim should not be paid. Atlantic did not provide adequate information that would indicate to a reasonable surety that there was an issue with the coverage of the payment bond as to Clearwater's work. Madden's claims about initiating two telephone calls to Rondinelli that went unreturned, even if believed, were not sufficient under the circumstances to render Ulico's conduct unreasonable or lacking in good faith.

Not only does the surety have to act with reasonableness and good faith, the principal is bound by a reciprocal obligation of good faith and fair dealing. *Kransco v. American Empire Surplus Lines Ins. Co.,* 23 Cal.4th 390, 97 Cal. Rptr.2d 151, 2 P.3d 1, 11 (2000) (insurer and insured are bound by a reciprocal obligation of good faith and fair dealing). Embedded in this obligation is a duty to cooperate in timely fashion with the surety in processing and considering any claim. Atlantic may not ignore Ulico's reasonable requests, over a period of months, for information as to why Clearwater's claim should not be paid and then expect to assert an effective bond coverage defense after the claim is paid. The surety is not omniscient, and cannot be expected to refuse claims on grounds about which it has not been informed adequately by the principal. If Atlantic believed the payment bond did not cover the work performed by Clearwater, as it apparently thought, then it should have informed Ulico when requested to do so. The likeliest source from which the surety may obtain reliable information about the nature of the work performed and its relation to the bond is from the principal. Its efforts to learn if such information existed having been frustrated, Ulico made a reasonable, good faith payment of the claim based on the information that was supplied to it by Clearwater.

*Glens Falls Indemnity Co. v. Carobine,* 36 N.Y.S.2d 253 (N.Y.City Ct.1942) is the most analogous case to the present one we were able to locate. In *Carobine,* the principal failed to co-operate with a surety company that payed a tax claim to the obligee, the government's collector of internal revenue, on

some bonded wine. The principal, a corporation, made various generalized claims as to why it was not liable for the tax. The City Court of New York found that the surety could only have contested the case on the basis of information supplied by the corporate principal. The court further found that the principal spoke to the surety "only in generalities and it can hardly be said that payment by the [surety] in the circumstances disclosed at the time was a voluntary one." *Carobine,* 36 N.Y.S.2d at 255. Ultimately, the court held that there was "no justification for [the surety's] refusal to pay the government's claim valid on its face when the principal . . . gave it no substantial basis upon which to resist payment." *Id.* (citation omitted).

Likewise, in the present case, we are unable to say that payment under the circumstances disclosed at the time Ulico paid Clearwater's claim was anything but a reasonable good faith payment. Ulico's claim payment to Clearwater resulted from Atlantic's failure to cooperate timely in Ulico's investigation. As the Circuit Court noted, "[Ulico] having not received any additional information from [Atlantic], discharged the debt owed to Clearwater. . . . Although [Ulico] made several requests for information from [Atlantic], no written documentation was sent until January 5, 2000 after [Atlantic] had received notice that [Ulico] had paid Clearwater's claim." The repeated correspondence from Ulico to Atlantic requesting information or documentation evidences the surety's diligent investigation of the matter. *See, e.g., Banque Nationale de Paris S.A. v. Ins. Co. of North America,* 896 F.Supp. 163, 165 (S.D.N.Y.1995) (summary judgment granted in favor of surety where it was undisputed that surety "investigated and evaluated [the principal's] alleged defenses before settling"); *United States v. D Bar D Enterprises, Inc.,* 772 F.Supp. 1167, 1170 (D.Nev.1991) (parties may expect surety to settle only after investigation of claims, counterclaims, and possible defenses); *Continental Cas. Co. v. American Sec. Corp.,* 443 F.2d 649, 650 (D.C.Cir.1970) (upholding summary judgment for surety where uncontradicted affidavits stated that all claims had been paid by surety "in good faith after investigation").

The reasonable behavior required of a surety acting in good faith is not meant to foster reluctance on a surety's part to satisfy bond claims. We agree with the court in *General Accident Insurance Co. of America v. Merritt–Meridian Construction Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y.1997), which explained:

> Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims. The many parties to a typical construction contract—owners, general contractors, subcontractors and sub-subcontractors—look to sureties to provide assurance that defaults by any of the myriad other parties involved will not result in a loss to them. Courts have recognized that "as a practical matter the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business."

(citations omitted). The surety in the present case acted diligently and reasonably based on the information available to it. The reasonableness requirement is meant only to filter the most egregious, careless, or inattentive conduct, short of fraud, of a surety; such as making a payment on a bond that the surety clearly knows or should know is not covered by the bond. Had the surety in the present case been told in a timely fashion by the principal the details of why Clearwater's claim was not covered by the bond and the documentation provided that illustrated such a defense, a reasonable and diligent surety might not have made payment.

Atlantic renews its argument from the Court of Special Appeals that the Proof of Claim form submitted by Clearwater was defective and, therefore, could not support a claim by Ulico for reimbursement of the paid claim under the indemnity agreement, Atlantic repeats its assertion that because Clearwater specified in the Proof of Claim that its work was done in performance of its contract with Atlantic, and not in

performance of the subcontract between Atlantic and Gilbert, there was no payment obligation by Ulico as Atlantic's surety.

We agree with the Court of Special Appeals that the Proof of Claim form was not defective. As the intermediate appellate court observed, the completed Proof of Claim stated that the work done by Clearwater was "for repair to equipment used on paving job at I–85 North, Granville County project," which is the project in question. It was reasonable for Ulico to assume that the "equipment used on paving job at I–85 North, Granville County project" was the construction project it had bonded for Atlantic. After receiving the Proof of Claim, Cherie Rondinelli, the Bonds Claims Manager for Ulico, wrote to John Madden at Atlantic to inform him that Clearwater was alleging it was owed $21,842.48 on the project and asking him to inform Ulico of Atlantic's reasons for delaying payment to Clearwater. On 3 September 1998, Thomas Madden responded with a letter stating that Atlantic had sent Clearwater a check for $4,834.14 in partial payment of Clearwater's bill and that the balance ($15,864.54) was "being disputed and must be resolved prior to completion of payment." In Atlantic's letter, Thomas Madden refers to "the above referenced project" which is "Project No. 8. 1370303 I–85 NBL from south rest area to north of Vance County Line ACM Job No. 556, Letter No. 174." In addition, the subject of the letter is the payment bond in question. Atlantic's letter, at least implicitly, if not explicitly, assumes that Clearwater's claim is covered by the bond, and it was reasonable for Ulico to conclude that Clearwater's claim was covered.

### B.

Finally, we turn to the question regarding attorneys' fees, costs, and expenses. In Maryland, following the "American Rule," a prevailing party ordinarily is not entitled to recover attorneys' fees as part of compensatory damages. *Hess Constr. Co. v. Bd. of Educ.*, 341 Md. 155, 159, 669 A.2d 1352, 1354 (1996) (citations omitted). Litigation expenses, however, may be awarded where the parties' contract provides for fees and costs. *Allfirst Bank v. Dep't of Health & Mental*

*Hygiene,* 140 Md.App. 334, 373, 780 A.2d 440, 463 (2001) (citation omitted). A contractual obligation to pay attorneys' fees generally is valid and enforceable in Maryland. *Qualified Builders, Inc. v. Equitable Trust Co.,* 273 Md. 579, 584, 331 A.2d 293, 296 (1975); *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship,* 122 Md.App. 283, 294, 712 A.2d 126, 131 (1998). Absent misconduct or fraud, over-reaching, misrepresentation, or other grounds for voiding the contract, a contractual provision for awarding attorneys' fees may be enforced. *Noyes,* 122 Md.App. at 294, 712 A.2d at 131.

Where an award of attorneys' fees is called for by the contract in question, the trial court will examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable. *Rauch v. McCall,* 134 Md.App. 624, 638, 761 A.2d 76, 84 (2000). The reasonableness of attorneys' fees is generally a factual determination within the "sound discretion of the trial judge and will not be overturned unless clearly erroneous." *Reisterstown Plaza Assocs. v. Gen. Nutrition Ctr., Inc.,* 89 Md.App. 232, 248, 597 A.2d 1049, 1057 (1991) (citations omitted); *Danziger v. Danziger,* 208 Md. 469, 474, 118 A.2d 653, 656 (1955) (an award of attorneys' fees will not be disturbed unless the trial court acted arbitrarily or its judgment was clearly wrong).

"The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees." *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship,* 100 Md.App. 441, 454, 641 A.2d 977, 983 (1994). *See also Friolo v. Frankel,* 373 Md. 501, 527, 819 A.2d 354, 370 (2003) (setting forth standards for the award of attorneys' fees).

In the present case, the trial court properly concluded that, under the terms of the indemnity agreement, Atlantic was obligated by contract to pay Ulico the sums it incurred to enforce the agreement, which included its attorneys' fees, costs, and expenses. Indemnity agreements of this kind are interpreted generally to entitle the surety to recover fees,

costs, and expenses incurred in enforcing them. *See Fid. & Deposit Co.,* 722 F.2d at 1166.

As the Court of Special Appeals aptly put it:

When a contract entitles a party to recover attorney's fees, the trial court must examine the fee request to determine whether it is reasonable, even in the absence of a provision requiring that the fee request be reasonable. *Rauch v. McCall,* 134 Md.App. 624, 638, 761 A.2d 76 (2000). In this case, the trial court's decision on the issue of reasonableness necessarily was affected by its decision, in error, that Ulico only was entitled to reimbursement for part of the monies it paid to Clearwater. Accordingly, the reasonableness of the sums sought by Ulico for attorneys' fees, costs, and expenses must be reconsidered in light of our decision that Ulico is entitled to full reimbursement of its payment to Clearwater.

*Ulico,* 150 Md.App. at 700–01, 822 A.2d at 1271.

Equally apt, the intermediate appellate court, because it had decided to reverse and remand the case, encouraged the trial judge on remand to reconsider Ulico's prayer for attorneys' fees, costs, and expenses on the inferred basis that the earlier award may have been predicated on a proportionality relationship to the limited recovery afforded under the indemnity agreement. We shall affirm the Court of Special Appeals, and remand the case to the Circuit Court 1) to award Ulico as damages the full amount it paid to Clearwater;[1] and 2) to

---

**1.** Though our disposition (similar to that of the intermediate appellate court) of this case would seem to have the effect of Clearwater recovering twice for the $4,834.14 paid on account of its 15 May 1998 bill, once by Atlantic in August 1998 and again by Ulico in January 1999, our judgment should not be read to mean that Atlantic or Ulico may not be able, all other things being equal, to proceed against Clearwater to correct that windfall. Clearwater, in signing the Ulico release, represented that "the sum of $20,698.62 is justly due and owing by contract to [Clearwater] and that [Clearwater] has not released or discharged the same or any part hereof, that there are no counterclaims or set-offs to said account. . . ." As is now apparent, Clearwater's claim, at that time, had been reduced by Atlantic's payment of $4,834.14 on account of the 15 May 1998 bill.

reconsider Ulico's contractual claim for attorneys' fees, costs, and expenses in light of its entitlement to the full indemnification claim.

## JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.

BATTAGLIA, J., dissents and files opinion joined by BELL, C.J., and ELDRIDGE, J.

BATTAGLIA, Judge, dissenting, joined by BELL, C.J. and ELDRIDGE, J.

The majority gets it right in this case—almost. I cannot quarrel with the majority's conclusion that "the repairs made by Clearwater to Atlantic's equipment added to the value of that equipment and, thus, were not 'labor and materials' covered by the bond." Majority op. at 306. Nor do I dispute the majority's holding that a surety's duty of good faith requires it to act reasonably in settling or paying claims. *Id.* at 307. I even agree with the majority that the record does not establish, *as a matter of law*, that the payment by Ulico (the surety) to Clearwater (the obligee) over the objection of Atlantic (the principal) was made in bad faith or was unreasonable. Where the majority falters, however, is in deciding that the payment was reasonable, *per se*.

The traditional definition of a surety is "someone who contracts to answer for the debt or default of another." EDWARD G. GALLAGHER, THE LAW OF SURETYSHIP 1 (2d. ed. 2000) (hereinafter "Gallagher"); *SNML Corp. v. Bank of North Carolina*, 41 N.C.App. 28, 254 S.E.2d 274 (1979). Defined more narrowly, "a surety is a person who binds himself for the payment of a sum of money, or for the performance of something else, for another who is already bound for such payment or performance." *SNML Corp.*, 254 S.E.2d at 279. A surety relationship involves three parties: (1) the principal, "the one for whose account the contract is made, whose debt or default is the subject of the transaction"; (2) the obligee, "the one to whom the debt or obligation runs"; and (3) the surety, "the one who agrees that the debt or obligation

running from the principal to the [obligee] shall be performed [or paid], and who undertakes on his own part to perform [or pay] it if the principal does not." ARTHUR A. STEARNS, LAW OF SURETYSHIP § 1.4 (5th ed. 1951); Gallagher at 1. Typically, in such an arrangement, the surety only suffers a loss if the principal does not perform its obligation to the obligee and then is unable to reimburse the surety for payments that the surety made to the obligee. Gallager at 1. A surety also suffers loss, however, when it fails to exercise good faith in paying an obligee's claim that falls outside the terms of the bond agreement. *See The Hartford v. Tanner*, 22 Kan.App.2d 64, 910 P.2d 872, 877 (1996); *City of Portland v. George D. Ward & Assoc., Inc.*, 89 Or.App. 452, 750 P.2d 171, 174 (1988).

Most courts agree that sureties should not be reimbursed for claim payments unless the payments were made in good faith. This is so for two reasons. First, the indemnity agreements that often accompany bonds usually provide that reimbursement is available only if the surety paid the obligee's claim in good faith. Gallagher at 488. Second, in the absence of such a "good faith" provision, courts have held that the surety's duty to exercise good faith arises from an implied covenant of good faith and fair dealing, which is inherent in all contracts. *Id.* at 534; *Tanner*, 910 P.2d at 878 ("The obligation of good faith and fair dealing on the part of the surety is implied and in a sense superimposed on the entire surety contract."); *City of Portland*, 750 P.2d at 175 (stating that, although the indemnity agreement contained no "good faith" clause, the surety "was bound by its implied covenant of good faith to exercise its discretion in compromising the claim").

Although courts generally agree that sureties are entitled to be reimbursed for claims paid in good faith, they are sharply divided as to what it means to exercise good faith. A number of courts have concluded that a surety has breached its duty of good faith only when the surety acted with an improper motive. *See* Gallagher at 491 (describing the majority view and citing cases in which courts have adopted it). That is, in order for the principal to show that the surety paid a claim to the obligee in bad faith, the principal must present evidence

demonstrating that the surety acted fraudulently or with ill-will. *See, e.g., PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.,* 267 Conn. 279, 838 A.2d 135, 152 (2004); *Fidelity and Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1165 (4th Cir.1983); *Engbrock v. Federal Ins. Co.,* 370 F.2d 784, 787 (5th Cir.1967). As one court explained, "[g]ross negligence or bad judgment is insufficient to amount to bad faith." *U.S. Fidelity & Guar. Co. v. Feibus,* 15 F.Supp.2d 579, 587 (M.D.Pa.1998), *aff'd* 185 F.3d 864 (3rd Cir.1999).

Other courts have assigned a different meaning to "good faith.," one that evaluates a surety's payment according to a standard of reasonableness. These courts have concluded that, even if there is no evidence of fraud or ill-will, the surety has fallen short of its good-faith duty by unreasonably or negligently paying an obligee's claim on the bond. *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal.App.4th 464, 483 (1996) ("[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive."); *Tanner,* 910 P.2d at 880; *City of Portland,* 750 P.2d at 174; *see* Gallagher at 493. Therefore, as the court in *City of Portland* reflected, to show bad faith under this standard, the principal "[need] only prove that [the surety] failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that [the surety] acted for dishonest purposes or improper motives." 750 P.2d at 175.

The parties in the present case entered into an indemnity agreement in which Atlantic promised to reimburse Ulico "for any and all disbursements made by it in good faith, under the belief that it was liable, or that such disbursement was necessary or prudent." This provision serves as the source of Ulico's duty to exercise good faith in paying Clearwater's claim. In determining the meaning of "good faith" in this context, the majority correctly embraced the latter of the two views described above, stating the duty of good faith "allows the surety a discretion limited by the bounds of *reasonable-*

*ness,* rather than the bounds of fraud." Majority op. at 309 (emphasis added).

The trial judge in this case, however, did not apply this standard of good faith. The judge's order stated: "Because [Atlantic] failed to prove fraud on the part of [Ulico], it is clear that [Ulico] has proven its case and is entitled to stand upon the letter of the [indemnity agreement]." As the majority explains, however, Atlantic did not have to prove fraud to show bad faith and avoid having to reimburse Ulico; rather, the question of bad faith turned on whether Ulico's payment to Clearwater was reasonable. Majority op. at 308–09. Up to this point in the analysis, I share the majority's views.

The majority's analysis goes awry, however, when it fails to delegate the determination of the reasonableness of Ulico's payment to the fact-finder. Instead of remanding this case for such a fact-finding, the majority assumes the role of fact-finder and finds that the surety's payment here was reasonable *as a matter of law.* This approach is flawed for three reasons: the question of reasonableness is for the fact-finder; the circumstances in this case do not establish that Ulico's payment was reasonable; and, the majority's holding will allow courts to enforce indemnity agreements where the surety has paid a claim unreasonably.

First, appellate courts should not make determinations of reasonableness because, as this Court has observed, such questions generally fall within the province of the fact-finder. *Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 494, 727 A.2d 915, 922 (1999). Appellate courts ordinarily do not determine reasonableness because the trier of fact is in the best position to "account[ ] for the circumstances of the individual case and the credibility of the witnesses and evidence presented at trial." *Id.; Informed Physician v. Blue Cross,* 350 Md. 308, 332, 711 A.2d 1330, 1342 (1998) ("[W]hat will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact in each particular case . . . .") (quoting *Allview Acres v. Howard,* 229 Md. 238, 244, 182 A.2d 793, 796 (1962)); *Wilson v. Morris,* 317

Md. 284, 295, 563 A.2d 392, 397 (1989) (stating that the issue of reasonableness was "a question of fact for the jury"); *see Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 13, 327 A.2d 502, 512 (1974) (stating that what constitutes a "reasonable time" is ordinarily a "question[ ] of fact based upon all the surrounding circumstances"). In the specific context of this case—where the good faith of a surety is determined by the reasonableness of its payment of a bond claim—courts have assigned the reasonableness inquiry to the trier of fact. *See Tanner*, 910 P.2d at 880 (explaining that, in previous appellate proceedings in the case, the court had remanded the case because "the reasonableness of the payments made by [the surety] is a fact question that must be litigated"); *City of Portland*, 750 P.2d at 175 (reviewing a whether sufficient evidence supported the jury's determination of good faith under a reasonableness standard). Because this Court and other courts disfavor the practice of appellate courts declaring what is reasonable, this case should be sent back to the trial court for a fact-finder's assessment of Ulico's good faith under the reasonableness standard.

The majority also is wrong because the facts of this case do little to establish that Ulico acted reasonably in satisfying Clearwater's claim. The majority points out that several factors have guided courts outside of Maryland "in determining whether a surety made a reasonable, good faith settlement under the terms of the bond and the indemnity agreement." Majority op. at 309. The majority's list of relevant factors includes: "(1) the obligations of the surety as provided by the terms and coverage of the bond, (2) whether the principal has made more than generalized demands that the surety deny the claim, (3) the cooperation, or lack thereof, by the principal, in dealing with the surety, [and] (4) the thoroughness of the investigation performed by the surety." *Id.* (citations omitted).

Although all of these factors are relevant, the majority's analysis places much too much emphasis on just one of these factors, the principal's lack of cooperation with the surety. The majority states: "Atlantic did not provide adequate infor-

mation that would indicate to a reasonable surety that there was an issue with the coverage of the payment bond as to Clearwater's work." Majority op. at 312. The majority followed the reasoning of the state trial court decision in *Glens Falls Indem. Co. v. Carobine*, 36 N.Y.S.2d 253 (N.Y.City Ct.1942). The surety in that case moved for summary judgment in its suit against the principal who refused to reimburse a bond claim that the surety had satisfied. *Id.* at 254. Although the claim was not covered by the terms of the bond agreement and should not have been paid, the trial court granted the surety's motion solely on the ground that the principal objected to the bond payment with nothing more than "generalities," which "gave [the surety] no substantial basis upon which to resist payment." *Id.* at 255. In the present case, Atlantic's communication to Ulico was not so general. Atlantic informed Ulico by letter that $4,834.14 had been paid already and that the remaining bills from Clearwater were "being disputed and must be resolved prior to completion of payment."

The reasonableness inquiry, however, should involve more than an assessment of the principal's cooperation with the surety. The surety also has a responsibility to understand the terms and coverage of the bond agreement and carefully investigate the nature of the claim from all available sources, including the obligee. Should the surety then learn for certain that a particular claim is not covered by the bond yet pays it nonetheless, the payment, in my view, could not pass the reasonableness test. In the instant case, Atlantic was not the only source from which Ulico could have obtained information about the coverage of Clearwater's claim. Clearwater, itself, had knowledge of the specifics of its contract with Atlantic and the work it completed on Atlantic's machinery. The information provided by Clearwater in the Proof of Claim form and billing statements, by no means, establishes that its charges to Atlantic were covered by the surety bond. In fact, because of the nature of the work described in Clearwater's bills to Atlantic (i.e., substantial repairs to durable machinery), the documents should have alerted Ulico that Clearwater was not

entitled to payment under the bond agreement for "labor and materials," a document that Ulico relied upon at trial. As an entity engaged in the business of insuring construction contracts, Ulico should have considered that such substantial repairs to durable machinery might add to the value of that equipment and, thus, fall outside the coverage of the bond.

A reasonable surety well might have investigated Clearwater's claim with greater scrutiny before paying the claim. In *Tanner*, the court held that the reasonableness of a surety's payment depends in part on the thoroughness with which it investigated each bond claim. 910 P.2d at 880–81. The court recognized that "the surety's investigation is 'standard practice' in the industry." *Id.* Affirming the trial court's factual finding that the surety's payments were unreasonable, the court was persuaded by the fact that the surety "did not conduct a thorough investigation" but rather "simply paid the claims and sought indemnification." *Id.*

Evidence in the present case raises similar questions about the surety's claim investigation. After the initial request for a Proof of Claim form, Ulico did not consult Clearwater to learn more about the nature of the service provided to Atlantic. When Atlantic's President allegedly did attempt to contact Ulico by telephone, the surety neglected to return the messages. Considering these circumstances, a trier of fact could conclude that Ulico's efforts to investigate the Clearwater claim were less than thorough.

Finally, not only is the majority conclusion regarding reasonableness incorrect, the precedent established by that conclusion could lead to unjust enforcement of unreasonable surety payments. If Ulico's payments were reasonable under the present circumstances, the same could be said of a surety who pays the claim even though the principal is, for some other reason, unable to communicate promptly with the surety. Such a situation might arise where the principal is conducting business overseas or where the principal has not received the surety's notification of the obligee claim. The majority's holding gives broad license to sureties to settle

claims only on the basis that they have not received detailed instructions from the principal. No longer must sureties seek clarification from sources other than the principal or concern themselves with the specific terms of the bond agreements. A finder of fact might very well determine that sureties should be held to a much higher standard of conduct than what the majority dictates is reasonable.

I would reverse the judgement of the Court of Special Appeals and remand this case for an application of the appropriate standard and so that a fact-finder, not appellate judges, can determine whether Ulico's payment of the Clearwater claim was reasonable.

Chief Judge BELL and Judge ELDRIDGE authorize me to state that they join in this dissent.