OPINION OF THE COURT
ROSENN, Circuit Judge.
Appellants Mash Enterprises (“MASH”), Howard Vogel, and Mark Fried appeal from the District Court’s judgment arising out of a contract to sell the assets owned by MASH to ProLease Atlantic Corporation (“ProLease Atlantic”). The District Court, following a bench trial, concluded that ProLease Atlantic owed nothing more under the contract and, after accounting for various set-offs to which it is entitled, had actually overpaid $2,450.00. The Court further found fraud and negligent misrepresentation on the part of Vogel and Fried and awarded ProLease Atlantic $316,330 attorney’s fees and costs (as the prevailing party in the litigation under Paragraph 28 of the asset Purchase Agreement). Because we believe the District Court overlooked or misconstrued certain major provisions of the contract that we discuss below, we vacate the judgment of the District Court and remand for further proceedings with respect to the amount due on the promissory note and the amount due ProLease Atlantic for costs and attorney’s fees.
I.
We have diversity jurisdiction under 28 U.S.C. § 1332 and the parties agree that Maryland law governs this dispute. We exercise plenary review over the District Court’s legal determinations and review factual conclusions for clear error. Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004).
Because we write primarily for the parties who are familiar with the facts and procedural background of this case, we will reiterate only those facts that will be useful to our discussion.
*128 Both parties are professional employer organizations; that is, they provide human resource services for other companies. They become the nominal employer of a client’s employees, providing payroll, health benefits, and insurance. They then lease the employees back to their clients. Under the purchase agreement, MASH sold ProLease Atlantic the right to administer the employees of MASH’s clients. ProLease agreed to pay MASH on what was essentially a per employee basis for each transferred employee it had been administering. The parties dispute the number of employees to be paid for under the Purchase Agreement.
In ascertaining whether MASH breached its purchase agreement with ProLease Atlantic, it is important to note that both parties were professional employer organizations experienced in that business. They played on the same level field, and each knew that because of the nature of their business it would be impossible to determine accurately the number of employees to be transferred from MASH to ProLease Atlantic as of the sale date of June 30, 2000.
Because of this uncertainty in accurately fixing the number of employees at the time the purchase agreement was executed, the parties provided for a six month recalculation or “look-back” period to give Pro-Lease Atlantic a sufficient opportunity to ascertain the exact number of employees that were transferred to it in the sale. ProLease Atlantic’s payment of only half of the tentative purchase price and its promissory note for the balance lent itself to such adjustments. To that end, the contract provided that if ProLease Atlantic determined during this Recalculation Period that fewer than 97% of the eligible employees remained on ProLease Atlantic’s payroll the principal balance of the Promissory Note would be reduced. It further provided, as the District Court found, that “[i]n the event of a diminution of the principal balance of the Promissory Note ... ProLease Atlantic was to deliver to [MASH] an Allonge to the Promissory Note setting forth the new principal balance.” [1]
*129 Thus, under the contract, MASH yielded to ProLease Atlantic the opportunity to adjust the balance on the note “based upon the application of the Reduction Formula,” subject to MASH’s “right to review Pro-Lease Atlantic’s records to verify the accuracy of ProLease Atlantic’s calculation of the Post Reduction Amount.” Paragraph 2 of the contract also provided for additional adjustments to the purchase price based upon client contracts entered into by MASH which had not begun as of the purchase date. The contract noted that more than one allonge may be necessary because of these contracts. Fried testified, inter alia, that the purpose of the recalculation provision was to give the buyer comfort that at the end of 180 days it could review the number of employees transferred and “make any adjustments, if necessary, to the purchase price.”
These provisions and testimony make it very clear that the number of employees and purchase price set forth in the contract were only tentative, subject to review and recalculation of the principal balance. Both parties understood that the ultimate amount due on the note was subject to modification after the “look-back” period of six months.
II.
The contract is explicit and unqualified with respect to the calculation of the number of employees “on the Buyer’s Payroll” as of November 28, 2000. Employees who worked less than thirty (30) hours per week were designated as “Part-time Employees” and also would be counted as “Eligible Employees” subject to certain limitations. (See Purchase Agreement 2A, A 85).
The parties understood that the nature of the business made it difficult to fix accurately the number of employees to be transferred at time of closing. Witnesses from both parties agreed that it was difficult to determine the number of employees that should be paid for. After the 180-day Recalculation Date, ProLease Atlantic gave notice that the number of employees was only a little more than half of the employees tentatively called for in the contract. ProLease Atlantic also advised MASH that it was further reducing the amount owed under the promissory note to account for various set-offs, including overpaid insurance and administrative fees.
The District Court agreed with ProLease Atlantic that the correct number of employees under the contract as of the Recalculation Date was 1,853, and reduced the amount owed on the promissory note accordingly. On appeal, MASH only disputes the District Court’s number by 268 employees, arguing that the lower court clearly erred by excluding employees who were on ProLease Atlantic’s payroll as of the recalculation date. The District Court excluded these employees on the basis that those clients had notified MASH before the Recalculation Date that they would terminate their contracts with ProLease Atlantic before the end of the current year. ProLease Atlantic, however, processed each client’s payroll until the end of the year, which was after the Recalculation Date. Although ProLease Atlantic’s contracts with these clients were eventually terminated, the uncontroverted evidence proves that the employees of these clients remained on ProLease Atlantic’s payroll until after the Recalculation Date.[2] (D. Ct. *130 Op. at 4, 8-9). That is all the contract required; that was the negotiated deal.
There is no reason to exclude clients whose contracts were terminated, or who gave notice of termination, before or after the Recalculation Date.[3] ProLease Atlantic attempts to obscure the clear language of the contract by arguing in terms of “active employees,” “current employees,” and “terminated employees.” None of these terms are used in the Purchase Agreement in calculating the reduction in the purchase price. The officers of ProLease Atlantic testified that “business logic” dictates that the company should refuse to pay for clients that would soon be terminated. That understanding, however, was not asserted during the negotiations or reflected in the Purchase Agreement. The contract language is unmistakable; the Buyer’s payroll is to determine the number of employees eligible to be counted. No other method of measuring the number of employees for the reduction in purchase price is given in the contract.
In any case, although ProLease claims to have “terminated the contract” with Aquahab prior to the recalculation date by an exchange of letters, this only meant that the contract would not be renewed for the next year. ProLease did not cease to provide services for Aquahab and Aquahab did not stop paying for them. The true “effective” end date of the contract between ProLease and Aquahab was Dec. 31. If ProLease had taken the Aquahab employees off of payroll, then the employees would not have been counted under the Purchase Agreement. Rather than focus on the legal relationship between Pro-Lease and Aquahab, the Purchase Agreement was concerned with their functional relationship — that is, whether ProLease was processing the client’s payroll.
The District Court’s opinion offers no justification for its decision to exclude these employees from the list, except that ProLease Atlantic’s expert did so.[4] However, the expert excluded those employees because ProLease Atlantic directed him to do it.[5] The District Court’s inquiry extends only to the details of whether the clients were terminated for good cause before the Recalculation Date. (D. Ct. Op. at 8-9). The Court never challenged the rationale for excluding these “terminated” employees in the first place.
ProLease Atlantic’s argument on appeal is that the phrase “on the Buyer’s payroll” is ambiguous. The phrase is not ambiguous in any sense. “[0]n the Buyer’s payroll” clearly refers to all eligible employees as of the agreed date. The parties, all in the same type of business, chose the phrase for its specificity. They were not *131 neophytes in this industry. ProLease Atlantic did not represent in the District Court that the phrase was unclear in any way, and the District Court did not even hint at the possibility of ambiguity in the phrase.
The Purchase Agreement provides absolutely no basis to exclude clients who had indicated their intent to terminate prior or after the Recalculation Date. The purpose of the date was to determine how many customers ProLease Atlantic was still serving 180 days after the sale, not how many it would be serving at any other date. The contract makes no distinctions between long-term clients and those for whom November or December would be their last month on payroll. The only way to reduce the number of employees under the contract is to reduce “the number of Eligible Employees on the Buyer’s payroll at the Recalculation Date.” (Purchase Agreement 2d(i)). Because ProLease Atlantic continued to process the payroll for those clients that had determined to end their relationship at year’s end, those clients, numbering 268, must be counted under the contract language.
III.
The District Court concluded that Vogel and Fried, the joint owners of MASH, were hable to ProLease Atlantic for fraud. The court reached this conclusion on the ground that they failed to disclose (1) that the group health insurance policy included employees of a company not sold to ProLease Atlantic; (2) that they had permitted some clients, so they could obtain insurance benefits, to falsely designate relatives and acquaintances as employees which also caused ProLease Atlantic to pay extra in premiums; and (3) they inflated the number of Eligible Employees sold to ProLease Atlantic.
Under Maryland law, a fraud judgment must be supported by clear and convincing evidence that the material misrepresentation was made with knowledge of the statement’s falsity and with intent to defraud. Gross v. Sussex, Inc., 332 Md. 247, 630 A.2d 1156, 1161 (1993). There is insufficient evidence in this record to support a finding by clear and convincing evidence that either Vogel or Fried knowingly or recklessly misrepresented the number of employees or made misstatements about the employees under the health plans. The evidence is particularly lacking with respect to Vogel. The exaggerated number of employees to be transferred under the tentative provision of the Purchase Agreement is not sufficient proof of fraud under the circumstances of this transaction.
The District Court focused on Fried’s failure to make an accurate client list at the time of sale. The entire fraud holding is based on the finding that given “the extent of the inaccuracy in the eligible employee Client List the conclusion is inescapable that [Fried and Vogel] had to have [inflated the number of employees] knowingly.” We can find no trial testimony of Vogel’s involvement in compiling this list. Moreover, witnesses for both sides testified about the difficulty to discern the number of “Eligible Employees,” as called for in the contract. Further, although the Court assumed that the Client List was incorrect at the time of sale, it made no finding and, apparently, no analysis at all of what was the correct number as of that date. The expert testimony that the District Court accepted was based on payroll records commencing after the closing date. Both parties recognized that the exact number of employees would not be fixed at the time of the sale, but only after the “look-back” period, 180 days later. The *132 contract assumes the initial list would be inaccurate.
Finally, there was no evidence that Vogel or Fried attempted to conceal anything which cast doubt on their representations to ProLease Atlantic. Before the closing, MASH generated a client list to support its calculation. The contract explicitly provided that ProLease Atlantic could recalculate the number of employees based on MASH’s records, reduce the purchase price accordingly, and gave Pro-Lease Atlantic 180 days to do it. This generous provision does not support fraud but demonstrates candor and openness. Furthermore, Vogel testified that he and Fried “left everything” to ProLease Atlantic after the asset transfer, including “all files, all paperwork ... we literally walked away from that office and the business, and we left everything intact, the computers, everything.” Vogel and Fried provided ProLease Atlantic with multiple opportunities and adequate time to discover the precise number of employees transferred and to lower the purchase price accordingly. Both parties structured the transaction on this basis.
Although ProLease Atlantic had the right to rely on their representations, Vogel and Fried did not behave as though they had knowingly made false statements about the material facts with the intent to defraud ProLease Atlantic. The District Court pointed to no clear and convincing evidence sufficient to support an inference of knowledge of misstatement and intent to defraud. It merely made an assumption because of the differences in the numbers asserted at the time of sale and the final number after the Recalculation Date. The mechanism for reducing the price in the purchase agreement itself demonstrates that the parties anticipated these differences might occur.
However, the evidence is sufficient to support the District Court’s finding of negligent misrepresentation. Under Maryland law, a contractual relationship may give rise to a duty of care. See Walpert, Smullian & Blumenthal, P.A. v. Katz, 361 Md. 645, 762 A.2d 582, 589 (2000). Vogel does not contest the District Court’s conclusion that he and Fried owed ProLease Atlantic a duty of care. The contract contained an acknowledgment that ProLease Atlantic was relying on their representations. (Purchase Agreement 6(u)). Pro-Lease Atlantic has also proved proximate damages, because, at minimum, the misstatements of fact regarding the health insurance plans caused ProLease Atlantic to overpay on insurance premiums.
There remains whether the false statements were made negligently. Although there is insufficient evidence to prove Vogel and Fried made intentional misrepresentations for the purpose of defrauding ProLease Atlantic, the evidence is sufficient to support the District Court’s findings that their conduct amounted to negligence.
Although we reverse the District Court’s finding of fraud and affirm the finding of negligent misrepresentation, this has no effect on the amount of money due either party. Under the Purchase Agreement MASH is entitled to the correct purchase price and ProLease Atlantic is entitled to the off-sets as determined by the District Court.
IV.
There is little law in Maryland on how to determine the prevailing party in a contractual dispute when both parties have prevailed on some claims and not on others. As we have stated before, “[u]sually a common-sense comparison between relief sought and relief obtained will be sufficient to indicate whether a party has prevailed.” *133 Institutionalized, Juveniles v. Sec’y of Pub. Welfare, 758 F.2d 897, 911 (3d Cir.1985). Therefore, prevailing party status may be decided independently of the party for whom judgment is actually awarded. Id.
Although MASH has prevailed in the matter of the 268 excluded employees, which may amount to a maximum of $335,000, and in the fraud claim, we uphold the District Court’s finding that ProLease Atlantic is the prevailing party and is, under the contract, entitled to fees and costs. ProLease Atlantic is entitled to set-offs of about $231,933, as calculated by the District Court. MASH claimed the full amount still due under the contract, which amounted to $1,915,316 and ProLease Atlantic sought to rescind the contract or reduce the amount due from $1,915,316 to $25,531. After the setoffs, the most Pro-Lease Atlantic could owe to MASH is about $325,884 plus interest at the rate specified by the contract. This represents only about 17% of what MASH claimed was still due under the contract.
ProLease Atlantic is the prevailing party, but that does not mean it is automatically entitled to a full recovery of its legal fees and costs. The Purchase Agreement provides that the “prevailing party in any legal proceeding between the parties to this Agreement shall be entitled to its attorneys’ fees and costs.” (Purchase Agreement H28) There is no mention of reasonableness. In contrast, the indemnification clause in the Purchase Agreement provides in relevant part that MASH, Vogel, and Fried shall indemnify ProLease Atlantic “from and against any and all costs, losses and damages (including reasonable expenses and reasonable legal fees), resulting from or arising out of,” inter alia, any misrepresentations made by MASH, Vogel, and Fried. (Purchase Agreement If 11) (emphasis added).
Under Maryland law, when a fee application is made pursuant to a contractual right, a court must examine the request for reasonableness, even if the contract contains no such requirement. See, e.g., Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co., 380 Md. 285, 844 A.2d 460, 478 (2004) (“Where an award of attorneys’ fees is called for by the contract in question, the trial court will examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable.”). Accordingly, the District Court must evaluate Pro-Lease Atlantic’s attorneys’ fees and costs request for reasonableness.
Both MASH and ProLease Atlantic assume that only one of them will be a prevailing party, and their arguments are limited to the issue of which one of them has prevailed. The parties fail to address how much the prevailing party is entitled to if it has not prevailed on all of its claims. The Purchase Agreement provides no direction on how to calculate the prevailing party fees and costs when the parties have only partially prevailed on their claims. Neither party proposes, at least to this Court, that the prevailing party award should be limited to fees and costs incurred in relation to the specific claims on which they were successful.
MASH prevails on its breach of contract claim to the extent that it is entitled to payment on the Promissory Note for approximately 268 employees that were on ProLease Atlantic’s payroll at the Recalculation Date. This may amount to approximately $325,000 award for MASH under the promissory note. In all other respects, ProLease Atlantic prevailed on its breach of contract claim against MASH. Indeed, MASH concedes that ProLease Atlantic is entitled to a 77% reduction in the promissory note to account for the attrition in Eligible Employees at the Recalculation *134 Date and for various overcharges and uncompensated services.
In sum, ProLease Atlantic is the prevailing party because MASH has been largely unsuccessful in its claims against ProLease Atlantic, and ProLease Atlantic succeeded in having the balance on the promissory note reduced substantially as a result of this litigation. However, because Pro-Lease Atlantic does not prevail on every aspect of its breach of contract claim, or on its fraud claim, we remand this matter to the District Court with directions to reevaluate the reasonableness of the award of attorneys’ fees and costs.
V.
For reasons that follow, we vacate the judgment of the District Court and remand for further proceedings consistent with this opinion with respect to the amount due on the promissory note and the amount due ProLease Atlantic for costs and attorney’s fees.

. The District Court summarized the Purchase Agreement:
The purchase price for the Purchased Assets ... was ... the product of $1250 and the number of "Eligible Employees” on [MASH’s] payroll on the date of Closing. The Purchase Price was also subject to certain adjustments ...
If, within one hundred eighty (180) days following the closing of the transaction ("the Recalculation Date”), ProLease Atlantic determined that less than 97% of the Eligible Employees remained on Pro-Lease Atlantic’s payroll, the principal balance of the Promissory Note would be reduced by the product of $1250 and the difference between: (1) 97% of the Eligible Employees and (2) the number of the Eligible Employees on ProLease Atlantic’s payroll as of the Recalculation Date (the "Reduction Formula”). In the event of a diminution of the principal balance of the Promissory Note under the Reduction Formula, ProLease Atlantic was to deliver to [MASH] an Allonge to the Promissory Note setting forth the new principal balance of the Promissory Note based upon the application of the Reduction Formula (the "Post-Reduction Amount”). [MASH] also had the right to review ProLease Atlantic's records to verify the accuracy of ProLease Atlantic’s calculation of the Post-Reduction Amount. (The 180 day period following the Closing was also referred to at trial as the "look-backperiod”).-...
The term "Eligible Employee” was defined in Paragraph 2(a) of the Purchase Agreement: The Eligible Employees shall be those employees who shall work at least thirty (30) hours per week and shall have been on the Seller’s payroll for at least twelve (12) weeks prior to the Closing. Mash Enters, v. ProLease Atl. Co., 2004 WL 405794, at *1-3 (E.D.Pa.) (footnotes omitted).

. It is unclear whether the employees of Ventresca, one of the companies excluded under this methodology, should be counted as Eligible Employees under the contract. The parties agreed in the amendment to the Purchase Agreement that ProLease Atlantic would not purchase the contracts of Fried’s company, PLC. ProLease Atlantic argues that Ventresca *130 was a client of PLC and MASH fails to address this contention (Reply at 8). Whether the Ventresca employees were part of the assets purchased by ProLease Atlantic must be determined by the District Court on remand.

. It appears that at least one of the excluded clients gave notice of termination after the Nov. 28, 2000 recalculation date. Robinson Pallet notified ProLease Atlantic that it would terminate its relationship on December 1, 2000.

. Charles Lunden, ProLease Atlantic's expert, stated that he excluded the employees because his client told him to, telling him those "clients had terminated prior to the expiration of the look back period and to the extent they were on the payroll, this was done for the convenience of the clients.”

. When pressed for its reason for the exclusion, ProLease Atlantic could only point to its own interests: "My logic for [the exclusion] is I paid — $1250 was the purchase price per full employee.... So, in my opinion, I'm not going to pay $1250 as a logic — business logic to Mr. Howard Vogel ... for a client that's not going to be there.”